**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE FEB 1 3 2014

Madsen, C.J.
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Feb 13 2014

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 88020-4 |
| v. | ) | |
| | ) | En Banc |
| PHILLIP BARRARA GARCIA, JR., | ) | |
| | ) | |
| Petitioner. | ) | Filed ___FEB 1 3 2014___ . |
| | ) | |

WIGGINS, J.—Phillip Garcia Jr. challenges his convictions for kidnapping in the first degree, burglary in the second degree, and criminal trespass in the first degree. He argues that that there is insufficient evidence to support each of the alternative means of kidnapping presented to the jury, that the trial court violated his confrontation rights by limiting his cross-examination of an adverse witness, that the trial court erroneously admitted evidence of a prior crime of dishonesty, and that the prosecutor incorrectly defined "burglary" during closing arguments.

We reverse Garcia's convictions for kidnapping in the first degree because there is insufficient evidence to support each of the alternative means of kidnapping presented to the jury. We reverse his conviction for burglary in the second degree because of prejudicial trial error. We affirm his conviction for criminal trespass in the first degree because the errors were not prejudicial as to that conviction.

FACTS

On June 6, 2010, Garcia was convicted of burglary in the second degree, criminal trespass in the first degree, and kidnapping in the first degree with a deadly weapon enhancement. The convictions were based on the following testimony:

In the early morning of December 24, 2009, Garcia was cut off by three cars while driving near Sedro-Woolley. He heard two gunshots coming from the cars. Believing that the people in the cars were chasing him, he tried to escape. In the process, he hit a railway track, and the car became stuck. Garcia abandoned the car and a passenger on the tracks and ran. Eventually, he made it to a nearby Valero gas station. He testified that he thought the gas station would be open and that he could ask for help. However, the gas station's doors were locked. After trying to kick the doors open, Garcia picked up a cinder block and broke the glass door. Surveillance cameras showed him entering the store, turning around, and walking out, without going near the cash register or causing other property damage inside. Garcia testified that he walked out of the gas station after hearing an alarm because he had outstanding warrants and did not want to go to jail.

After leaving the gas station, he tried knocking on the door of a nearby house. The occupant would not open the door but spoke with him briefly through the door. Garcia told her that he needed help and that people were trying to kill him. When the occupant told him that she would call 911 but would not open the door, Garcia left.

He next ran to a mobile home park where Juliana Wilkins happened to be asleep on the sofa of her late father's home. Garcia saw the television on and

2

entered the trailer through an unlocked door. It was 3:55 a.m. when Garcia tapped Wilkins on her upper thigh to wake her up. She had never seen Garcia before these events.

Garcia remained with Wilkins in the mobile home for around two hours. She testified that during that time he "was extremely agitated," on "an adrenaline rush, very jumpy and out of breath." She also testified that his "behavior was very unpredictable."

The timeline of what happened inside the mobile home is not clear. There was testimony that Garcia sat in a chair five or six feet away from where Wilkins sat on the couch and the two talked. He explained his situation to Wilkins and asked her to give him a ride. She declined. He also made numerous telephone calls, trying to find someone else to pick him up. At some point during the two hours, Garcia grabbed a knife from the kitchen. He briefly held the knife two feet away from Wilkins. Otherwise, he kept the knife in his pocket. At trial, he explained that the knife was to protect himself and Wilkins from the people Garcia believed were after him.

During their conversations, they talked about their families, and Wilkins gave him advice. She told him that she had 10 children and hoped to go home to them. She testified that she desired to keep the situation calm, while Garcia testified that he felt like Wilkins was helping him and tagging along.

At one point, Garcia decided to leave without having found a ride. Wilkins walked him to the door and gave him a necklace with religious significance. Garcia, however, returned within moments. Eventually, he was able to find a friend who

3

agreed to pick him up. This friend talked with Wilkins on the phone to get directions. As Garcia was leaving, he offered to give Wilkins back the necklace. She declined and hugged Garcia.

Wilkins testified that she was very, very terrified during the event. She believed that she might be killed, and her fear did not decline while Garcia was in the residence.

Before trial, the State filed a motion in limine to have all statements made by Garcia to others excluded as hearsay. The prosecutor argued that they were being offered to prove the truth of the matter asserted, and argued at multiple times that Garcia was trying to get the statements into evidence without taking the stand. Defense counsel countered that the statements were necessary to give a complete picture of what happened in the mobile home and were important for determining Garcia's intent. The judge did not make a firm ruling as to the statements but said he would consider them objection by objection.

During trial, the court allowed the jury to know that Garcia had previously been convicted of felonies of dishonesty. The prosecutor used statements in a police report to establish that a previous burglary conviction involved intent to commit theft. During the prosecutor's closing argument, he told the jury that Garcia was guilty of burglary in the second degree if he intended to commit malicious mischief while throwing a cinder block into the Valero gas station.

Following the jury trial, Garcia was sentenced to 173 months of confinement. The Court of Appeals affirmed the convictions.

ANALYSIS

Garcia's kidnapping in the first degree and burglary in the second degree convictions are reversed and remanded for a new trial consistent with this opinion. The kidnapping conviction is reversed because there is insufficient evidence to support each of the three alternative means presented to the jury. The Court of Appeals also misinterpreted and misapplied the statutory elements of kidnapping in the first degree. The burglary conviction is reversed because the trial court erroneously admitted evidence of prior crimes of dishonesty. This error was prejudicial.

In the following discussion, we analyze whether there was sufficient evidence to support the kidnapping in the first degree conviction. We then address Garcia's argument that the trial court unjustifiably restricted his cross-examination of Wilkins. Finally, we analyze the trial court's admission of Garcia's prior convictions for crimes of dishonesty.

I.    Insufficiency of evidence for the alternative means of kidnapping in the first degree presented to the jury

We reverse Garcia's conviction for kidnapping in the first degree and remand for new trial because there is insufficient evidence to support each alternative means of kidnapping in the jury instructions. When alternative means of committing a single offense are presented to a jury, each alternative means must be supported by substantial evidence in order to safeguard a defendant's right to a unanimous jury determination. *State v. Smith*, 159 Wn.2d 778, 783, 154 P.3d 873 (2007); *see State v. Sweany*, 174 Wn.2d 909, 914, 281 P.3d 305 (2012). On review, we view the

"evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). The three alternative means presented during Garcia's trial were intentionally abducting Wilkins with intent "(a) to hold [her] as a shield or hostage, or (b) to facilitate the commission of Burglary in the Second Degree or flight thereafter, or (c) to inflict extreme mental distress on [her]." Jury Instruction 18; *see* RCW 9A.40.020(1) (kidnapping in the first degree). Garcia also disputes the Court of Appeals' interpretation of the kidnapping elements. We first review statutory interpretation of the kidnapping elements de novo, and then determine whether there is sufficient evidence to support each alternative means. *See Engel*, 166 Wn.2d at 576.

A. *The shield and hostage prong of kidnapping in the first degree*

The first alternative means of kidnapping in the first degree is to hold the victim as a shield or hostage. RCW 9A.40.020(1)(a). "Shield" and "hostage" are not defined in RCW 9A.40.020 or the accompanying provisions. And no clear interpretations have developed through our case law.

When determining the meaning of a statute, "[t]he court's fundamental objective is to ascertain and carry out the legislature's intent." *In re Det. of Danforth*, 173 Wn.2d 59, 67, 264 P.3d 783 (2011). "The legislature is presumed to intend the plain meaning of its language." *State v. Gibson*, 16 Wn. App. 119, 127, 553 P.2d 131 (1976). "In determining the plain meaning of a provision, we look to the text of the statutory provision in question, as well as 'the context of the statute in which that

6

provision is found, related provisions, and the statutory scheme as a whole.'" *State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010) (quoting *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005)). Courts may also turn to the common law for the meaning of undefined terms. *Engel*, 166 Wn.2d at 578-79. In criminal cases, fairness dictates that statutes should be literally and strictly construed and that courts should refrain from using possible but strained interpretations. *See State v. Bell*, 83 Wn.2d 383, 388, 518 P.2d 696 (1974).

The history of the kidnapping statute sheds light on the plain meaning of "hostage" and "shield." *See Ervin*, 169 Wn.2d at 820. The current kidnapping statutes, RCW 9A.40.020 and 9A.40.030, were adopted in 1975 as part of a comprehensive revision of the criminal code. *See* LAWS OF 1975, 1st Ex. Sess., ch. 260, §§ 9A.40.020, 9A.40.030, at 836-37. The pre-1975 kidnapping statute stated:

> Every person who shall wilfully,
> (1) Seize, confine or inveigle another with intent to cause him without authority of law to be secretly confined or imprisoned, or in any way held to service with the intent to extort or obtain money or reward for his release or disposition, shall be guilty of kidnapping in the first degree . . . .
> (2) Lead, take, entice away or detain a child under the age of sixteen years with intent to conceal him from his parent, parents, guardian or other lawful person having care, custody or control over him, or with intent to steal any article from his person, but without the intent to extort or obtain money or reward for his return, or shall abduct, entice, or by force or fraud unlawfully take or carry away another to or from a place without the state, and shall afterwards send, bring or keep such person, or cause him to be kept or secreted within the state without the intent to extort or obtain money or reward for his release or disposition, shall be guilty of kidnapping in the second degree . . . .

Former RCW 9.52.010 (1933) (repealed by LAWS OF 1975, 1st Ex. Sess., ch. 260, § 9A.92.010, at 863). The statute did not include the terms "hostage" or "shield." *See*

*id.*

Not only did the 1975 statute add the terms "hostage" and "shield," it also redefined the difference between kidnapping in the first degree and second degree and set forth three related crimes that are less serious in nature (i.e., unlawful imprisonment in the first and second degree and custodial interference). *See* JUDICIARY COMM. OF WASH. LEGIS. COUNCIL, LEGISLATIVE COUNCIL'S JUDICIARY COMMITTEE, REVISED WASHINGTON CRIMINAL CODE 157-63 (Dec. 3, 1970) (Orange Code). The result was a gradation of related offenses.

The current first degree statute states:

> (1)   A person is guilty of kidnapping in the first degree if he or she intentionally abducts another person with intent:
> (a)   To hold him or her for ransom or reward, or as a shield or hostage; or
> (b)   To facilitate commission of any felony or flight thereafter; or
> (c)   To inflict bodily injury on him or her; or
> (d)   To inflict extreme mental distress on him, her, or a third person; or
> (e)   To interfere with the performance of any governmental function.
> (2)   Kidnapping in the first degree is a class A felony.

RCW 9A.40.020.   "Kidnapping in the second degree" is defined as intentionally abducting another person under circumstances not amounting to kidnapping in the first degree and is a class B felony.   RCW 9A.40.030.   The defendant's intent distinguishes the two degrees of kidnapping.   While kidnapping in the second degree requires only an intentional abduction, kidnapping in the first degree requires an additional specific intent. *See* RCW 9A.40.010, .020.

One purpose of the new criminal code was to establish this graded scheme of crimes, which distinguishes among the severity of different gradations and leads to

8

more appropriate sentences. *See* Orange Code, *supra*, at staff preface ("Finally, the introduction of a structure of degrees of felonies should allow for more rational grading of individual offenses because of the greater ease with which comparative judgments about the relative severity of different offenses may be made. Consequently, this proposed code provides a fairer and more consistent treatment of various similar criminal activities than does present law."). A broad interpretation of the specific intent element undermines the legislature's purpose for creating a graduated scheme because it blurs the line between first and second degree kidnapping.

Turning to common law, courts in other jurisdictions have interpreted the meaning of "hostage." As background, many states adopted statutes that included the terms "hostage" and "shield" around the same time as Washington. *See, e.g.*, ALA. CODE § 13A-6-43 (1975); ALASKA STAT. § 11.41.300 (1978), ARIZ. REV. STAT. ANN. § 13-1304 (1977), ARK. CODE ANN. § 5-11-102 (1975). The drafters in Washington examined criminal statutes from other states and looked to the American Law Institute's *Model Penal Code* when crafting the 1975 revisions to the criminal code. Orange Code, *supra*, at ii, 158; *see* MODEL PENAL CODE § 212.1 (Proposed Official Draft 1962) (intent element of kidnapping is satisfied if defendant's purpose is "to hold for ransom or reward, or as a shield or hostage").

Most judicial definitions of "hostage" are the same: a hostage is someone "held as security for the performance, or forbearance, of some act by a third person." *State v. Crump*, 82 N.M. 487, 493, 484 P.2d 329 (1971); *see Jenkins v. State*, 248 S.W.3d 291, 297 (Tex. Ct. App. 2007); *Ingle v. State*, 746 N.E.2d 927, 939 (Ind.

9

2001); *State v. Moore,* 315 N.C. 738, 746, 340 S.E.2d 401 (1986); *State v. Stone,* 122 Ariz. 304, 309, 594 P.2d 558 (Ariz. Ct. App. 1979). One emphasis in these cases is that the person held as a hostage cannot be the person from whom performance or an act is requested, meaning the hostage must be held to coerce someone else to act. *See Crump,* 82 N.M. at 493; *Jenkins,* 248 S.W.3d at 297; *Ingle,* 746 N.E.2d at 939; *Moore,* 315 N.C. at 746; *Stone,* 122 Ariz. at 309.

The definition of "shield" has not been widely addressed in courts throughout the country. In the only case cited in the briefs that defined "shield" for kidnapping purposes, it was held to imply "the holding or detaining of a person by force as defense or potential protection against interception, interference, or retaliation by law enforcement personnel." *Stone,* 122 Ariz. at 309. This definition encompasses the situation in *In re Personal Restraint of Glasmann,* in which the defendant positioned a woman between several police officers and himself while the officers had their guns drawn and the defendant held the woman "around the neck so that she could not breathe." 175 Wn.2d 696, 720-21, 286 P.3d 673 (2012) (Wiggins, J., dissenting) (reversed and remanded because of prosecutorial misconduct). A "shield" was defined in a nonkidnapping case as "a felon's use of an innocent person by force as a potential protection against retaliation." *Kress,* 105 N.J. Super. at 521-22 (A murder case involving a victim who was used as a shield during a bank robbery. The victim was used as cover when one of the defendants was attempting to exit the bank.).

In light of this statutory background, proof of first degree kidnapping under the hostage/shield means requires proof that the defendant intended to use the victim

10

as security for the performance of some action by another person or the prevention of some action by another person. It is not sufficient that the defendant intentionally abducts another person, which would be second degree kidnapping. Rather, there must be some intent to use the victim as protection for the perpetrator. Anything less would collapse the distinction between first and second degree kidnapping.

The evidence here established an intentional abduction of Wilkins, but it was insufficient to find that Garcia intended to use Wilkins as a hostage or shield. There is simply no evidence of such an intent. The Court of Appeals reasoned: Garcia wanted to avoid arrest; if he released Wilkins, she would notify the police; so long as Garcia detained Wilkins, she could not notify police; therefore, a jury could find that Garcia harbored the intent to use Wilkins as a hostage or a shield. *State v. Garcia*, noted at 168 Wn. App. 1018, 2012 WL 1918961, at *7.

The appellate court decision is entirely speculative, hypothesizing possible intentions that are unsupported by any evidence. Moreover, the theory that Garcia awakened Wilkins so that he could restrain her in order to prevent her from calling the police is inherently illogical; if Garcia's intent was to keep Wilkins from calling the police, he never would have entered and awakened her in the first place. Most important, this speculation would elevate incidents of second degree kidnapping into first degree kidnapping based solely on speculation.

We must avoid this strained interpretation. *See Bell*, 83 Wn.2d at 388. We hold, therefore, that the evidence fails to support the hostage and shield prong because no reasonable jury could have found beyond a reasonable doubt that Garcia intended to hold Wilkins as a hostage or shield. No evidence was admitted

at trial to support a claim that Garcia intended to hold Wilkins as security for the performance, or forbearance, of some act by a *third person*. No demands were made on third persons. The incident involved primarily communications between Garcia (the abductor) and Wilkins (the abducted). This does not meet the definition of "hostage." Similarly, there was no evidence at trial indicating that Garcia intended to use Wilkins as a shield because there is no evidence that Garcia used Wilkins as protection from intervention or retaliation. He did not physically put Wilkins between himself and others trying to pursue him. Therefore, this alternative means fails for insufficient evidence. To hold otherwise would frustrate the graduated scheme created by the legislature and be contrary to the plain language of the statute.

B. *The extreme mental distress prong of kidnapping in the first degree*

The second alternative means of committing first degree kidnapping is to act with intent "[t]o inflict extreme mental distress." RCW 9A.40.020(1)(d). "Extreme mental distress" is not defined by statute, and case law has failed to provide a clear interpretation. Again, examining the provision in the context of the legislative scheme is helpful to determine legislative intent. *Engel*, 166 Wn.2d at 578.

The first element of kidnapping is an intentional abduction. RCW 9A.40.020(1), .030(1). "'Abduct' means to restrain a person by . . . using or threatening to use deadly force." RCW 9A.40.010(1). Therefore, intentionally restraining someone by threatening use of deadly force is, without more, kidnapping in the second degree. *See* RCW 9A.40.010(1), .030(1). If while doing this a defendant intends to "inflict extreme mental distress" on the victim, the defendant has committed kidnapping in the first degree. RCW 9A.40.020(1)(d). The

12

Washington State Training Commission's manual, published shortly after the 1975 revisions, noted:

> Both the kidnaping [sic] sections require an intentional abduction, the difference between then [sic] being the first degree's requirement of proof that the victim was kidnaped [sic] to accomplish a further purpose, e.g. the obtaining of ransom, to inflict injury, etc.

WASH. STATE CRIMINAL JUSTICE TRAINING COMM'N, REVISED CRIMINAL CODE TRAINING AND SEMINAR MANUAL, at 9A.40-1 (Gordon A. Golob & Gerald K. Mooney eds., 1976) (Manual). Reading the requirements of kidnapping in the first and second degree together makes it clear that some additional intent must be present to elevate a crime from kidnapping in the second degree to kidnapping in the first degree. Otherwise, the statutory distinction would be meaningless.

Therefore, a reasonable interpretation of "extreme mental distress" is an intention to cause more mental distress than a reasonable person would feel when being restrained by the threat of deadly force. When measuring the level of mental distress intended, the focus must be on the mental state of the defendant rather than the actual resulting distress. This is because kidnapping in the first degree focuses on the intent of the defendant rather than the result on the victim. *See* RCW 9A.40.020(1); Manual, *supra*, at 9A.40.020-2.

Therefore, the extreme mental distress prong requires an intent to cause mental distress above that of "regular" abductions, meaning those falling under kidnapping in the second degree. This is a fact-specific determination. In some cases, the method of abduction (i.e., threat of deadly force) may be so extreme as to evidence an intent to cause extreme mental distress. However, it should not be

assumed that every time a person is abducted by someone showing a weapon that the defendant intends to inflict extreme mental distress.

Viewing the evidence in the light most favorable to the State, no reasonable jury could have found beyond a reasonable doubt that Garcia abducted Wilkins with the intent to inflict extreme mental distress. There was no evidence that Garcia threatened to kill or physically harm Wilkins. He showed Wilkins a kitchen knife for only a short while, and Wilkins testified that Garcia neither told her he was going to use the knife nor made threatening movements with it. This does not evidence intent to cause extreme mental distress.

Because there is not sufficient evidence to support two of the three alternative means of kidnapping presented to the jury, Garcia's kidnapping conviction must be reversed, and we remand for a new trial consistent with this opinion. *See State v. Wright*, 165 Wn.2d 783, 802 n.12, 203 P.3d 1027 (2009) ("The Washington Constitution provides greater protection of the jury trial right [than the federal constitution], requiring reversal if it is impossible *to rule out the possibility* the jury relied on a charge unsupported by sufficient evidence. Significantly, however, a defendant in such a position is entitled only to a new trial, not an outright acquittal, unless the record shows the evidence was insufficient to convict on any charged alternative." (citations omitted)). The trial court may not retry Garcia on the two alternative means for which we hold there is insufficient evidence. *See State v. Ramos*, 163 Wn.2d 654, 660-61, 184 P.3d 1256 (2008); *State v. Joy*, 121 Wn.2d 333, 345-46, 851 P.2d 654 (1993).

14

II.   Restriction of Garcia's right to cross-examine Wilkins

Garcia argues that the trial court violated his confrontation rights by limiting his cross-examination of Wilkins. An impermissible limitation on the scope of cross-examination is a violation of a defendant's right to confrontation. *See* U.S. CONST. amend. VI; *State v. Darden*, 145 Wn.2d 612, 620-21; 41 P.3d 1189 (2002). The scope of cross-examination is within the discretion of the trial court and will not be disturbed unless there is a manifest abuse of discretion. *Id.* at 619. "A trial court abuses its discretion if its decision 'is manifestly unreasonable or based upon untenable grounds or reasons.'" *State v. Lamb*, 175 Wn.2d 121, 127, 285 P.3d 27 (2012) (quoting *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). Therefore, the court erred if there was no lawful justification for restricting the cross-examination.

"All relevant evidence is admissible" unless it is limited by the constitution, the rules of evidence, or other applicable rules. ER 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. The court excluded statements made by Garcia that evidenced his state of mind. These statements were of consequence for the kidnapping charges because conviction for kidnapping in the first degree hinges on Garcia's intent. *See* RCW 9A.40.020(1). The only witnesses to Garcia's state of mind were himself and Wilkins. Wilkins's perception of his state of mind is relevant and would have been based, at least in part, on Garcia's statements to her.

Relevant testimony may be excluded from trial if it is hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). "Whether a statement is hearsay depends upon the purpose for which the statement is offered. Statements not offered to prove the truth of the matter asserted, but rather as a basis for inferring something else, are not hearsay." *State v. Crowder*, 103 Wn. App. 20, 26, 11 P.3d 828 (2000). The excluded statements were not offered for the truth of the matter asserted but were offered to prove Garcia's intent. Therefore, the trial court erroneously excluded the statements.

We analyze only the prejudicial effect of the error on the convictions for burglary in the second degree and criminal trespass in the first degree because we reversed the kidnapping conviction on other grounds. The error is not prejudicial, even under the constitutional harmless error test, because the error had *no* effect on his conviction for these crimes. Wilkins offered no testimony about Garcia's actions at the Valero gas station, which formed the basis for the burglary in the second degree charge. She had no personal knowledge about what transpired and offered no testimony about the event. Therefore, the erroneous limitation on her cross-examination had no effect on the conviction for burglary in the second degree.

Similarly, the limitation was not prejudicial with regard to Garcia's conviction for criminal trespass in the first degree. "A person is guilty of criminal trespass in the first degree if he or she knowingly enters or remains unlawfully in a building." RCW 9A.52.070(1). The entry is unlawful if "he or she is not . . . licensed, invited, or otherwise privileged to" do so. RCW 9A.52.010(5). "Only the person who resides in

or otherwise has authority over that property may grant permission to enter or remain." *State v. J.P.*, 130 Wn. App. 887, 892, 125 P.3d 215 (2005). There are statutory defenses available to defendants, including when the defendant "reasonably believed that the owner . . . would have licensed him . . . to enter . . . ." RCW 9A.52.090(3). Garcia did not raise these defenses at trial.

The testimony unaffected by the trial court's restriction on Wilkins cross-examination established that Garcia entered the mobile home through a door that was ajar and that Wilkins had never seen Garcia before, did not know him, and was not expecting anyone to visit the home that night. There is no evidence that she granted him permission to enter in the mobile home. Even under the constitutional error test, Garcia was not prejudiced because the "'overwhelming untainted evidence'" necessarily led the jury to a finding of guilt. *See State v. McDaniel*, 83 Wn. App. 179, 187-88, 920 P.2d 1218 (1996) (quoting *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985)).

III.    Admission of the prior felony for dishonesty

Garcia argues that the trial court erroneously admitted evidence to establish that his prior burglary-related convictions were crimes of dishonesty. We review evidentiary rulings under an abuse of discretion standard. *State v. Myers*, 133 Wn.2d 26, 34, 941 P.2d 1102 (1997). "A trial court abuses its discretion if its decision 'is manifestly unreasonable or based upon untenable grounds or reasons.'" *Lamb*, 175 Wn.2d at 127 (quoting *Powell*, 126 Wn.2d at 258).

ER 609(a) allows impeachment of the credibility of a witness through evidence of past crimes. Admission is limited to crimes punishable by death or

imprisonment of one year and crimes involving dishonesty. *Id.* This evidence may be "elicited from the witness or established by public record during examination . . . ." *Id.*

We narrowly construe ER 609(a) because of the danger for injustice associated with admitting evidence of a criminal defendant's past convictions. *See State v. Newton*, 109 Wn.2d 69, 70, 75, 743 P.2d 254 (1987). When determining whether a conviction is a crime of dishonesty, a trial court is limited to examining "the elements and date of the prior conviction, the type of crime, and the punishment imposed." *Id.* at 71. The inquiry is slightly modified for burglary in the second degree because it is not a per se crime of dishonesty. *State v. Watkins*, 61 Wn. App. 552, 556-57, 811 P.2d 953 (1991). To determine whether a specific prior conviction for burglary is a crime of dishonesty, the trial judge may identify the crime the witness intended to commit inside the unlawfully entered building and look to the elements of that crime. *State v. Schroeder*, 67 Wn. App. 110, 117, 834 P.2d 105 (1992). The trial judge's inquiry into the facts of the underlying conviction is for the limited purpose of determining the predicate crime for the burglary conviction. *See id.* at 119. If the predicate crime was theft, a burglary conviction may be used as a crime of dishonesty under ER 609(a)(2). *Id.* at 115; *see Watkins*, 61 Wn. App. at 555-57.

The prosecution sought to impeach Garcia's credibility as a witness by proving that Garcia previously pleaded guilty to a burglary involving theft and a related conspiracy charge. It could not prove this through the record, meaning that the information, probable cause statement, judgment and sentence, and statement

on plea of guilty were devoid of evidence that Garcia intended to commit theft. Instead, the prosecution used a statement made by a coconspirator that was noted in a police report matching up with the documents in the court file. The Court of Appeals held this to be error but concluded that it was harmless.

We agree that the trial court abused its discretion but we disagree that it was harmless. Instead, we hold that the error requires reversal of Garcia's burglary conviction. The trial court improperly went beyond the court file when determining the predicate crime for Garcia's burglary conviction and relied on hearsay evidence. Washington case law has clearly established that an ER 609(a)(2) inquiry disfavors making broad factual inquiries into prior crimes. *See Newton*, 109 Wn.2d at 70-71. While a specific factual inquiry is necessary for burglary, the trial court should not have gone beyond the court file and relied upon a coconspirator's statement in a police record. *See Schroeder*, 67 Wn. App. at 120 (Burglary was used as a crime of dishonesty when the *record* was "replete with information that . . . prior burglaries were performed with intent to commit theft."). A statement in a police report is generally inadmissible hearsay unless it falls within a hearsay exception. *See In re Det. of Coe*, 160 Wn. App. 809, 829, 250 P.3d 1056 (2011), *aff'd on other grounds*, 175 Wn.2d 482, 286 P.3d 29 (2012).

An error in admitting evidence is ground for reversal if it is prejudicial. *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). An error is "'not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.'" *Id.* (quoting *State v. Tharp*, 96 Wn.2d 591, 599, 637 P.2d 961 (1981)). The Court of Appeals found the error to be

harmless because the trial court "sanitized" the prior convictions by excluding the fact that they involved burglary, one of the crimes for which Garcia was on trial. *Garcia*, 2012 WL 1918961, at *9. It also noted that Garcia did not "demonstrate that the . . . prior convictions negatively impacted the jury's evaluation of his credibility . . . ." *Id.* at *10. The Court of Appeals based this finding on the fact that the jury "was not persuaded [that] Garcia lacked all credibility" because it acquitted him of one count of burglary. *Id.* at *9. We find this reasoning unpersuasive.

The purpose of proving that Garcia had two prior felony convictions for dishonesty was to discredit his testimony. For the burglary charge, there was scant evidence from which a jury could infer Garcia's intent to commit a predicate crime. Although a surveillance camera captured him breaking into the Valero gas station, hearing the alarm, and leaving, Garcia testified that he entered the gas station only to seek safety. However, after hearing of two prior felonies for dishonesty, the jury discredited his testimony.

The prejudice against Garcia was magnified by the prosecution's incorrect description of burglary. Burglary in the second degree requires that Garcia enter or remain in the Valero gas station with intent to commit a crime against a person or property therein. *See* RCW 9A.52.030(1). Therefore, a conviction required that he not only trespass, but also intend to commit a crime against a person or property *inside* the burglarized building. *State v. Bergeron*, 105 Wn.2d 1, 4, 711 P.2d 1000 (1985); *see* RCW 9A.52.070 (The act of knowingly entering or remaining unlawfully in a building without the additional intent element is criminal trespass in the first degree.). In his closing and rebuttal arguments, the prosecutor argued that Garcia

committed burglary by throwing the cinder block through the door of the Valero gas station because the act of breaking the door became the predicate crime for the burglary. This is a misstatement of the law. It omits the requirement that the State prove the additional specific intent to commit a crime inside the building.[1]

Coupling the scant evidence of the intent element with the prosecutor's mistaken description of the crime of burglary and the improper admission of crimes of dishonesty, there is a reasonable probability that the trial court's error in admitting the crimes of dishonesty materially affected the outcome. Therefore, the burglary in the second degree conviction is reversed and remanded for a new trial.

The error did not prejudice Garcia with respect to the conviction for criminal trespass in the first degree. Garcia testified that he entered the home and did not indicate that he was invited or had permission to do so. In fact, he said that when he entered, he did not see Wilkins at first. Wilkins also testified that she did not know Garcia and had never seen him before. It unlikely that absent the error the outcome would have been different.

## CONCLUSION

Garcia's convictions for kidnapping in the first degree and burglary in the second degree are reversed and remanded for a new trial consistent with this opinion. We affirm Garcia's conviction for criminal trespass in the first degree.

---

[1] Alone, the prosecutor's misstatement is not a reversible error. If a defendant fails to object to the prosecutor's error at trial, the error is waived unless the defendant "establishes that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice." *In re Pers. Restraint of Glasmann*, 175 Wn.2d at 704. Garcia fails to establish that an instruction could not have cured the resulting prejudice. The trial court instructed the jury to disregard arguments not supported by the law as given in the jury instructions. It also instructed the jury as to the correct elements of burglary.

_____ Wiggins, J.

WE CONCUR.

_Result only_
_____ Madsen, C.J.

_____ Johnson, J.

_____ Owens, J.

_____ Fairhurst, J.

_____ J.M. Johnson, J.

_____ Stephens, J.

_____ González, J.

_____ Gordon McCloud, J.