# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 46153-6-II |
| Respondent, | |
| v. | |
| PEDRO GODINEZ JR., | UNPUBLISHED OPINION |
| Appellant, | |
| JOANNA KRYSTIN SPEAKS, | |
| Defendant. | |

JOHANSON, C.J. — Pedro Godinez, Jr. appeals his jury trial convictions for first degree attempted murder, first degree kidnapping, first degree robbery, first degree unlawful possession of a firearm, and his resulting sentence. He argues that the trial court improperly admitted the victim's hearsay statements, erred when it allowed a witness to testify wearing prison attire, and committed two sentencing errors. We hold that (1) the trial court did not err when it admitted the victim's excited utterances, (2) no prejudice resulted from the inmate testifying in her prison attire, (3) the trial court improperly added one point to Godinez's offender score, and (4) the trial court did not abuse its discretion when it determined that attempted murder and first degree robbery were not the same criminal conduct. Finally, we reject Godinez's assertion in his statement of

additional grounds (SAG) that he was improperly denied the opportunity to fully question certain jurors. We affirm Godinez's convictions, reverse his sentence, and remand for resentencing.

FACTS

I. BACKGROUND FACTS

In November 2012, Freddy Landstrom was at home when Joanna Speaks called him. Landstrom agreed to meet Speaks and drove to Speaks's apartment after midnight. Based on a receipt that the police collected, Landstrom stopped at a gas station at 1:56 AM and then continued directly to Speaks's home.

According to Landstrom, within a minute of his arriving at Speaks's apartment, Godinez entered with his gun pointed at Landstrom. Landstrom initially thought that Godinez was there to rob Speaks and him, but soon realized that it was a setup and that Speaks was involved. Still at gunpoint, Godinez ordered Landstrom to remove his jacket and to put his valuables on the bed.

Godinez then told Landstrom to get into Landstrom's car and to drive around the Vancouver area. As Landstrom drove, Godinez sat in the back seat with his gun pointed at Landstrom. After what seemed like hours to Landstrom, Godinez told him to pull over on a gravel road near a swamp. Godinez ordered Landstrom out of the car and told him to get on his knees, facing away from Godinez. Landstrom, who thought Godinez was preparing to shoot him, stood up and tried to talk Godinez out of it. Landstrom told Godinez he could keep his car and agreed not to report it as stolen until Godinez said it was okay. He also told Godinez he had over $10,000 in his various accounts and that Godinez could use the cards he had stolen to access that money.

Because Godinez told Landstrom that he could report his car stolen on Saturday, Landstrom thought he had convinced Godinez to spare his life as they walked down the gravel

2

road. But then Godinez ordered Landstrom to get back on his knees. Godinez shot Landstrom from a distance of about four or five feet, but the first bullet just grazed Landstrom's head. Landstrom turned to face Godinez, who shot him again in the chest. Landstrom was shot again in the hand and in the arm before he could run away and hide in a nearby swamp. Landstrom waited in the swamp for what "seemed like an eternity" and eventually wandered for at least a mile until he found someone to call the police. 2A Report of Proceedings (RP) at 466.

When the police arrived at about 4:30 AM, Vancouver Police Department Officer John Janisch contacted Landstrom. Officer Janisch said that Landstrom was "[v]ery stressed out, in a panic, [and] thinking he was going to die." 2A RP at 361. Minutes later the ambulance arrived and Officer Janisch accompanied Landstrom to the hospital to interview Landstrom and to learn what happened because he was afraid that Landstrom might not survive. Officer Janisch recorded Landstrom's statements in the ambulance and the State played the 23-minute-long recording at trial.

## II. PROCEDURAL FACTS

The State charged Godinez with attempted first degree murder, first degree kidnapping, first degree robbery, first degree unlawful possession of a firearm, and several other charges. At trial, the State moved to admit the recorded statement Landstrom gave while in the ambulance. The State agreed that the recording was hearsay, but argued that it was admissible as an excited utterance: a statement of Landstrom's then-existing mental, emotional, or physical condition and a statement for medical diagnosis or treatment. Godinez argued that "while I concur that if this was just statements by the victim that they would be admissible under those exceptions, these are

3

not just statements, though; this is an actual interview, question-and-answer situation, and obviously Defense wasn't there, wasn't able to cross-examine." 2A RP at 327.

After the State's offer of proof, the trial court admitted Landstrom's recorded statement as "excited utterance, then existing mental, emotional, or physical condition, and statements for the purpose of medical diagnosis or treatment, as well as present sense . . . impression." 2A RP at 356-57. Although the trial court did not directly address Godinez's confrontation clause concerns, it found that because Landstrom's statement did not identify Godinez, there was no prejudice. The State played the recording and Godinez made no further objection.

Landstrom testified to the facts as stated above and also identified Godinez in photographs taken from surveillance video at a gas station where Godinez had used Landstrom's bank cards. A forensic scientist testified that Godinez's deoxyribonucleic acid (DNA) was present on Landstrom's car's steering wheel. Another police officer testified that Landstrom's car was discovered at a motel where Godinez was staying.

The State called Speaks to testify. Speaks had already pleaded guilty to first degree robbery and witness tampering and was serving her sentence in prison as a result of this incident. Because Speaks did not have civilian clothes when she was transported to the courthouse from prison, she testified in her prison uniform. Godinez objected, arguing that "the clothing does go to -- diminishes the veracity of a witness when they're in jail garb" and requested that she be permitted to testify in civilian clothes. 2B RP at 572-73. The State told the trial court it planned to ask Speaks about her guilty plea and her role in the incident. The trial court overruled Godinez's objection because there were no civilian clothes available.

4

Speaks testified that she robbed Landstrom when she pulled a gun on him at her apartment and asked him to empty his pockets. She then told Landstrom to leave and did not see him or Godinez that night. Speaks claimed that she saw Godinez the next day, told him that Landstrom's credit cards were hers, asked him to use them to withdraw money for her, and did not see him again until she was in jail. Later, Speaks's father testified as an impeachment witness. He testified that Speaks told him Godinez had robbed Landstrom at gunpoint, had "removed the victim" with a gun from her apartment, and had shot him near a lake or a park. 2B RP at 655. Godinez did not testify nor did he call any witnesses in his defense.

A jury convicted Godinez of attempted first degree murder, first degree kidnapping, first degree robbery, and first degree unlawful possession of a firearm, with several enhancements and aggravators. At sentencing, the trial court agreed with the State that Godinez's convictions for attempted first degree murder and first degree kidnapping did not constitute the same criminal conduct because although the two crimes involved the same victim, murder and kidnapping do not require the same criminal intent, and the two crimes did not occur at the same time and place. Godinez disagreed. Godinez also objected to the addition of one point to his offender score based on "community custody" for a gross misdemeanor, but the trial court agreed with the State and added one point to his offender score. 5 RP at 1248.

Godinez appeals his convictions and sentence.

ANALYSIS

I. EXCITED UTTERANCE HEARSAY EXCEPTION

Godinez argues that the trial court abused its discretion because Landstrom's recorded statement is hearsay and no hearsay exceptions apply that permit its admission.[1] We disagree.

Godinez argues that Landstrom's recorded statement was not an excited utterance. He concedes that Landstrom endured a startling event but argues that Landstrom's recorded statement was not an excited utterance primarily because too much time elapsed between when he was attacked and when he gave the statement in the ambulance. We disagree.

We review the trial court's evidentiary rulings for an abuse of discretion. *State v. Garcia*, 179 Wn.2d 828, 846, 318 P.3d 266 (2014). The trial court "'abuses its discretion if its decision is manifestly unreasonable or based upon untenable grounds or reasons.'" *Garcia*, 179 Wn.2d at 846 (internal quotation marks omitted) (quoting *State v. Lamb*, 175 Wn.2d 121, 127, 285 P.3d 27 (2012)).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" in the statement. ER 801(c). Hearsay statements are inadmissible unless they fall within one of the exceptions in the Rules of Evidence. ER 802. One such exception is for the declarant's "excited utterances," defined as "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). To qualify as an exited utterance, a statement must meet three conditions: (1) a startling or exciting event must

---

[1] We assume, without deciding, that Godinez preserved this issue for appellate review.

have occurred, (2) the declarant's statement must have been made while he or she was under the stress of the startling or exciting event, and (3) the statement must be related to the startling or exciting event. *State v. Chapin*, 118 Wn.2d 681, 686, 826 P.2d 194 (1992).

Godinez argues that over two to three hours elapsed between shortly after 1:56 AM, when Landstrom arrived at Speaks's apartment, and 4:30 AM, when the police responded to the marina. Godinez argues this time lapse is evidence that Landstrom's statement was not spontaneous because he had too much time to consider fabricating a story. But Godinez does not understand the nature of the startling event that Landstrom experienced. The startling event did not end when Godinez fired the last bullet at Landstrom. Instead, Landstrom was still under the stress of the evening's startling events when he dove into the swamp, emerged from the swamp, and happened upon the marina because he had not yet arrived at a place of safety. Even minutes later when the police arrived and Landstrom was secured in the ambulance, he was still under the stress of the evening's startling events because he had been shot four times, was still bleeding, and thought he would die.

Therefore, Godinez's argument that too much time elapsed between Landstrom's arrival at Speaks's apartment and Landstrom's recorded statement is unpersuasive. We hold that the trial court did not abuse its discretion when it determined that the excited utterance exception to the hearsay rule permitted the admission of Landstrom's recorded statement.[2]

---

[2] Because Landstrom's statement was admissible as an excited utterance, we need not address the other hearsay exceptions that Godinez argues the trial court misapplied.

## II. Speaks's Testimony in Prison Attire

Godinez argues that the trial court erred when it permitted Speaks to testify in her prison attire without conducting a hearing or making findings "justifying [her] appearance." Br. of Appellant at 26. He argues that permitting Speaks to testify in her prison attire damaged her credibility. Even if the trial court erred, any error was harmless beyond a reasonable doubt.

The defendant's right to appear free from "all bonds or shackles" is grounded in the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution. *State v. Finch*, 137 Wn.2d 792, 842-43, 975 P.2d 967 (1999). These concerns apply to defendants and inmate witnesses similarly. *State v. Rodriguez*, 146 Wn.2d 260, 263-64, 269, 45 P.3d 541 (2002). We review alleged constitutional violations de novo. *State v. Johnson*, 180 Wn.2d 295, 300, 325 P.3d 135 (2014).

"[A]n inmate witness, whether testifying for the defense or the state, should not appear before a jury in restraints absent a finding of necessity by the trial court." *Rodriguez*, 146 Wn.2d at 269. In making this finding, trial courts should balance the defendant's right not to be prejudiced by his or a witness's appearance against the trial court's longstanding right to control security and provide order in the courtroom. *Rodriguez*, 146 Wn.2d at 265-68.

Assuming the trial court erred, we turn to a harmless error analysis. Godinez argues that a constitutional harmless error standard applies and any error was not harmless because testifying in prison attire damaged Speaks's credibility and had the jury believed Speaks's testimony, it "would have completely exonerated" Godinez. Br. of Appellant at 27. We disagree.

An error of constitutional magnitude is harmless when the reviewing court is "convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the

absence of the error." *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). Where there is a constitutional error, we presume prejudice and place the burden on the State to prove that the error was harmless beyond a reasonable doubt. *Guloy*, 104 Wn.2d at 425; *State v. Stephens*, 93 Wn.2d 186, 191, 607 P.2d 304 (1980).

Because Speaks testified that she was in prison serving a sentence for Landstrom's robbery, there was no prejudice resulting from the jury seeing Speaks in prison attire. Any inferences the jury may have made or information it may have gained from seeing Speaks in prison attire was merely cumulative of Speaks's testimony. Speaks's father also testified as an impeachment witness, contradicting her testimony and damaging her credibility much more severely. Further, in addition to Speaks's, her father's, and Landstrom's testimony identifying Godinez as his attacker, Godinez's DNA found in Landstrom's car, and the discovery of Landstrom's car at the motel where Godinez stayed all support the conclusion that the error was harmless. We are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result if Speaks had not testified in prison attire.

## III. OFFENDER SCORE

Godinez contends that the trial court improperly added a point to his offender score because he was on misdemeanor and not felony community custody. We agree and remand for resentencing.

### A. STANDARD OF REVIEW AND RULES OF LAW

We review the trial court's calculation of the defendant's offender score de novo. *State v. Olsen*, 180 Wn.2d 468, 472, 325 P.3d 187, *cert. denied*, 135 S. Ct. 287 (2014). We also review the sentencing court's interpretation of the Sentencing Reform Act of 1981 (SRA), ch. 9.94A

RCW, de novo. *State v. Jones*, 172 Wn.2d 236, 242, 257 P.3d 616 (2011). A defendant may raise a challenge to his offender score for the first time on appeal because "the sentencing court acts without statutory authority when it imposes a sentence based on a miscalculated offender score." *State v. Soper*, 135 Wn. App. 89, 104 n.11, 143 P.3d 335 (2006); *see also State v. Jones*, 182 Wn.2d 1, 6-7, 338 P.2d 278 (2014); *State v. Ford*, 137 Wn.2d 472, 477, 973 P.2d 452 (1999). It is the State's burden to prove a convicted defendant's criminal history to calculate his offender score. *Ford*, 137 Wn.2d at 480-81.

The SRA requires trial courts to add one point to a convicted defendant's offender score when the "present conviction is for an offense committed while the offender was under community custody." RCW 9.94A.525(19). "Community custody" is defined as "that portion of an offender's sentence of confinement in lieu of earned release time *or imposed as part of a sentence under this chapter*." RCW 9.94A.030(5) (emphasis added). "This chapter" refers to the SRA and the SRA permits sentencing courts to impose punishment, including community custody, on defendants convicted of only felonies. RCW 9.94A.505(1). The SRA requires sentencing courts to impose punishments on felony offenders consistent with its provisions and its "purpose" is to "make the criminal justice system accountable to the public by developing a system for the sentencing of felony offenders." RCW 9.94A.505(1), .010.

## B. ANALYSIS

Here, the trial court added one point to Godinez's offender score for his first degree attempted murder and unlawful possession of a firearm convictions because he was on "community custody" for a misdemeanor. 5 RP at 1241. Godinez's community custody officer testified that Godinez was on active "misdemeanor community custody" on the date of his offenses

for a prior fourth degree assault conviction and that Godinez was not, "[t]o [his] knowledge," on community custody for his prior first degree theft felony conviction.[3] 5 RP at 1199. Fourth degree assault is a gross misdemeanor. RCW 9A.36.041(2). The State also presented no evidence that Godinez's community custody was a "portion of [his] sentence . . . in lieu of earned release time." RCW 9.94A.030(5).

Because fourth degree assault is a misdemeanor and community custody could not have been ordered for that conviction under the SRA, the trial court improperly added one point to Godinez's offender score because he was on community custody. We reverse Godinez's sentence and remand for resentencing.

## IV. SAME CRIMINAL CONDUCT

Godinez argues that the trial court abused its discretion when it found that his first degree attempted murder and first degree kidnapping convictions did not constitute the same criminal conduct. We disagree.

### A. STANDARD OF REVIEW AND RULES OF LAW

We review the trial court's finding that two crimes did not constitute the same criminal conduct for an abuse of discretion or a "misapplication of the law." *State v. Graciano*, 176 Wn.2d 531, 537, 295 P.3d 219 (2013). Where the record supports only one conclusion regarding the defendant's conduct, the trial court abuses its discretion when it arrives at a contrary result. *Graciano*, 176 Wn.2d at 537-38. But if the record before the trial court supports either a conclusion

---

[3] It appears from the record that Godinez's community custody officer testified based on the judgment and sentence from his fourth degree assault and first degree theft convictions. But that document is not in the record.

11

that the defendant's crimes constituted the same criminal conduct or that they did not, the issue lies squarely in the trial court's discretion. *Graciano*, 176 Wn.2d at 538.

When a person is convicted of two or more serious violent offenses, the trial court must run the sentences for those offenses consecutively unless the trial court finds that the crimes constituted the same criminal conduct. RCW 9.94A.589(1)(b). Two crimes constitute the same criminal conduct when they "require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a). At sentencing, it is the defendant's burden to demonstrate that his crimes constituted the same criminal conduct. *Graciano*, 176 Wn.2d at 540. We construe the statute narrowly to "'disallow most claims that multiple offenses constitute the same criminal act.'" *Graciano*, 176 Wn.2d at 540 (quoting *State v. Porter*, 133 Wn.2d 177, 181, 942 P.2d 974 (1997)). The defendant's failure to establish any element defeats his or her claim that his or her crimes amounted to the same criminal conduct. *Graciano*, 176 Wn.2d at 540.

### B. ANALYSIS

The issue here is whether the trial court abused its discretion when it determined that the first degree attempted murder and first degree kidnapping did not require the same criminal intent and did not occur at the same time and place.

#### 1. SAME CRIMINAL INTENT

Godinez does not contest the same criminal intent element because he believes that the trial court found that his first degree attempted murder and first degree kidnapping crimes had the same criminal intent. We disagree and conclude that the trial court did not abuse its discretion when it found that Godinez's two crimes did *not* require the same criminal intent.

Two crimes require the same criminal intent if, when viewing them objectively, the defendant's criminal intent did not change from one crime to the next. *State v. Tili*, 139 Wn.2d 107, 123, 985 P.2d 365 (1999). This analysis requires us to first "objectively view each underlying statute" to determine whether the intents are the same. *State v. Price*, 103 Wn. App. 845, 857, 14 P.3d 841 (2000). If the intents are the same, we view the facts available to the trial court at sentencing to determine whether the defendant's intent was different regarding each count. *Price*, 103 Wn. App. at 857.

Here, the trial court found "some overlap in criminal intent [because kidnapping and attempted murder might both involve bodily injury] but [found] that they are not the same criminal intent and, as argued by the State, the attempted murder is quite a different intent than that of kidnapping." 5 RP at 1239. Examining the underlying statutes, attempted first degree murder and first degree kidnapping do not require the same criminal intent. First degree kidnapping requires an intentional abduction with intent to inflict bodily injury. RCW 9A.40.020(1)(c). Attempted first degree murder requires specific intent to cause another person's death. RCW 9A.28.020; RCW 9A.32.030. The required criminal intent is different because although first degree kidnapping may be done with intent to inflict bodily injury, intent to inflict bodily injury does not equate to a specific intent to cause death. The trial court did not abuse its discretion when it found that the attempted first degree murder and first degree kidnapping did not require the same criminal intent.

In addition, the facts here demonstrate that the attempted murder and the first degree kidnapping did not require the same criminal intent. As the State suggests, Landstrom almost talked Godinez out of shooting him by promising not to report the car theft and by telling him how

13

much money was available in his accounts. Godinez responded by telling Landstrom he could report his car stolen on Saturday, thereby implying Landstrom would be alive on Saturday to do so. This demonstrates that Godinez had not conclusively formed the intent to cause Landstrom's death when he kidnapped him because just moments before shooting Landstrom, Godinez considered other plans. Apart from the fact that he held Landstrom at gunpoint, no other evidence was available to the trial court to suggest that Godinez had planned to kill Landstrom when he kidnapped him.

Therefore, because kidnapping requires proof of intent to cause bodily injury and attempted murder requires specific intent to cause death and Godinez had not inexorably formed the intent to cause Landstrom's death when he kidnapped him, it was reasonable for the trial court to conclude that Godinez's crimes did not require the same criminal intent. The trial court did not abuse its discretion when it found that, based on this record, the attempted first degree murder and first degree kidnapping did not require the same criminal intent.

2. SAME TIME AND PLACE

Godinez appears to argue that his two crimes need not have occurred simultaneously to occur at the same time and place. We conclude that the trial court did not abuse its discretion when it found that Godinez's crimes did not occur at the same time and place.

Here, the trial court found that "[t]he kidnapping occurred at gunpoint at the apartment of Joanna Speaks in east Clark County; the attempted murder at a remote area of west Clark County." 5 RP at 1239. The court also relied on Landstrom's testimony that "it seemed like hours" passed between his arrival at Speaks's apartment, driving around the Vancouver area in Landstrom's car at gunpoint, and Godinez's decision to shoot him. 5 RP at 1239.

14

These findings are supported by the record and lead to only one conclusion—that the two crimes did not occur at the same time and place. The record shows that the kidnapping occurred over two hours before the attempted murder and that the kidnapping occurred in east Clark County and the attempted murder occurred in west Clark County. We defer to the trial court's discretion. *See Graciano*, 176 Wn.2d at 538.

The trial court did not abuse its discretion when it concluded that the first degree attempted murder and first degree kidnapping convictions did not constitute the same criminal conduct because they did not require the same criminal intent and did not occur at the same time and place. Godinez's argument fails.

## V. STATEMENT OF ADDITIONAL GROUNDS

In his SAG, Godinez also asserts that he was prejudiced by the trial court's decision not to permit questioning of a juror who was uncomfortable having her name announced in open court. We disagree.

Although there are three references to jurors' discomfort about having their names announced in court, the record does not support Godinez's argument that the trial court denied him the opportunity to question jurors about this issue. Godinez's counsel specifically stated that if he had any further concerns about the issue, he would file written motions. The record does not support his contention that the trial court denied him an opportunity to question the jurors fully.

No. 46153-6-II

We affirm Godinez's convictions, reverse his sentence, and remand for sentencing.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, C.J.

We concur:

BJORGEN, J.

MAXA, J.