
FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 JAN 29 AM 11: 55

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 74055-5-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED IN PART OPINION |
| | ) | |
| JENNIFER CATHRYN DREEWES, | ) | |
| | ) | |
| Appellant. | ) | FILED: January 29, 2018 |

SCHINDLER, J. — A jury convicted Jennifer Cathryn Dreewes as an accomplice to the crime of burglary in the first degree while armed with a firearm and the crime of assault in the second degree with a deadly weapon of Marty Brewer-Slater. Dreewes asserts insufficient evidence supports the convictions. In the alternative, Dreewes contends the court abused its discretion by admitting Facebook messages and prosecutorial misconduct during closing argument deprived her of a fair trial. Dreewes also challenges imposition of the mandatory victim penalty and DNA[1] fees. We hold sufficient evidence supports the jury conviction as an accomplice of burglary in the first degree while armed with a firearm, the court did not abuse its discretion by admitting the Facebook messages, Dreewes cannot show prosecutorial misconduct or that a curative instruction would not have obviated any prejudicial remark during closing argument, and

---

[1] Deoxyribonucleic acid.

the court did not err by imposing mandatory fees. Overwhelming evidence supports finding Dreewes guilty as an accomplice of the crime of assault "of another" with a deadly weapon. But under the law of the case doctrine, the to-convict jury instruction required the State to prove assault in the second degree with a deadly weapon of a specific person, Marty Brewer-Slater. Because the evidence does not support finding Dreewes knew she was promoting or facilitating the specific crime of assault of Marty Brewer-Slater, we reverse the conviction. We affirm the conviction as an accomplice of burglary in the first degree but remand to dismiss the conviction as an accomplice of assault in the second degree of Marty Brewer-Slater.

## FACTS

On January 12, 2014, Jennifer Dreewes called police to report personal property had been stolen from her truck. Marysville Police Officer Michael Buell met with Dreewes at her residence. Dreewes was "very upset." After she "calmed down," Dreewes told Officer Buell that the property was in her truck that was parked in front of her house. Dreewes identified the stolen property, including a Samsung laptop, an Apple iPhone, personal and business checks, credit cards, and two gold rings—one with a diamond.

The next day, Dreewes called Detective Belinda Paxton to report one of her stolen credit cards had been used. Dreewes sent Detective Paxton "a screenshot of her bank statement." Detective Paxton tried without success to obtain videotapes from the stores where the stolen credit card had been used.

Meanwhile, Dreewes went to one of the stores where the credit card had been used. A store employee described "the person who used her card" as "a skinny white

crack whore looking girl with pink hair" and a black eye. Dreewes called to give Detective Paxton the description. Dreewes told Detective Paxton that she put the "word out on Facebook® and also through [her] [nephew] and friends," asking if anyone knew the "[s]kinny, white crackhead with pink hair."

Michelle Thomas responded to Dreewes' Facebook post. Thomas and Dreewes were friends in high school. In 2014, Thomas was a 39-year-old unemployed single mother of two. Thomas posted a Facebook message telling Dreewes that her boyfriend Don Parrish knew "a whole lot more people" and could help identify the girl.

On January 15, Thomas posted a Facebook message telling Dreewes she had obtained several photographs of the pink-haired girl and the girl's name was "Ness." Dreewes and Thomas talked by phone six times and exchanged over 90 text messages that day.

On January 15 or 16, Dreewes gave Detective Paxton the "Facebook® ID[2] of Ness." Dreewes told Detective Paxton that the address in Marysville where "Ness" was staying was 10501 56th Drive Northeast. Dreewes said that a friend of her nephew Kyle Becker "said he saw [Dreewes'] things" at that house. Dreewes also provided the license plate number of an "SUV[3], a Blazer," parked in the driveway at 10501 56th Drive Northeast and the phone number for Ness.

Detective Paxton identified "Ness" as "Vanessa Miller" and the registered owner of the license plate for the SUV as Marty Brewer-Slater. Detective Paxton was not able to find any "link between" Ness or Vanessa Miller and Marty Brewer-Slater. Detective Paxton called the telephone number for Ness and left a voice mail message asking

---

[2] Identification.
[3] Sport utility vehicle.

Ness to contact the police. Afterward, Dreewes called to tell Detective Paxton she "heard that Ness got a phone call from a detective and was going to run." Detective Paxton told Dreewes the police needed to obtain the necessary information before seeking a warrant.

Between January 14 and January 23, Dreewes and Thomas exchanged approximately 170 Facebook messages about retrieving the stolen property and bringing the pink-haired girl to Dreewes to "bash in her face" or "use her as a pinata." Thomas did not take the exchanges seriously until Dreewes sent a Facebook message on January 17.

On January 17, Dreewes sent a Facebook message saying she would pay Thomas and Parrish "$300 for tracking . . . down" the girl with the pink hair. At approximately 9:30 p.m.[4] on January 22, Dreewes sent Thomas a Facebook message confirming that "my laptop and stuff is 100% in that house." Dreewes told Thomas she had received $1,500 from her insurance company for the stolen items and if the police did not know she recovered her property, there would be money to pay Thomas. Dreewes texted Thomas:

> If I get my laptop back but not through the cops I don't have to tell my insurance company that just paid me $1500 for it "wink wink" . . . . If you get my laptop back and cops don't know about it I can keep the $1500 and get you some more $$.

Thomas asked Dreewes to clarify exactly what she wanted Thomas and Parrish to do. Dreewes responded, "I want my shit. . . . I want her to have 2 black eyes and her to go to jail."[5] Thomas responded, "[W]e can do the shit and black eyes but jail we can't

---

[4] The Facebook records are in Coordinated Universal Time (UTC). UTC is eight hours ahead of Pacific Standard Time (PST). We have converted UTC to PST throughout the opinion.

[5] Alteration in original.

do." Dreewes told Thomas to "nab" Ness and bring her to Dreewes' barn in Arlington. Thomas asked Dreewes how many "people in the house and any weapons." Dreewes told Thomas her nephew Kyle said there would be four to five people in the house at 10501 56th Drive Northeast and "don't go there unless packing."

| | |
|---|---|
| **Recipients** | Michelle Thomas . . .<br>Jennifer Dreewes . . . |
| **Author** | Michelle Thomas . . . |
| **Sent** | 2014-01-23 06:04:20 UTC [(January 22, 2014 at 10:04 p.m. PST)] |
| **. . . .** | |
| **Body** | how many people in the house and any weapons? |
| **Recipients** | Michelle Thomas . . .<br>Jennifer Dreewes . . . |
| **Author** | Jennifer Dreewes . . . |
| **Sent** | 2014-01-23 06:05:27 UTC [(January 22, 2014 at 10:05 p.m. PST)] |
| **. . . .** | |
| **Body** | Kyle said 4-5 and yes he said don't go there unless packing.[6] |

Dreewes and Thomas exchanged 13 more Facebook messages on January 22. Dreewes and Thomas also talked to each other by phone the morning of January 22 and exchanged 10 text messages between 11:55 a.m. and 11:38 p.m. on January 22.

At 8:06 a.m. on January 23, Thomas sent Dreewes a Facebook message. Thomas told Dreewes that she and Parrish went to 10501 56th Drive Northeast but no one answered and "all doors were locked along with available windows." Thomas said they would go back to the house later that day.

Thomas and Parrish returned to 10501 56th Drive Northeast at approximately 1:20 p.m. Parrish carried a semiautomatic rifle under his coat. Thomas carried a pistol and duct tape and zip ties in her backpack.

---

[6] Boldface in original.

5

Rohen Brewer-Slater and his wife Marty Brewer-Slater had lived at 10501 56th Drive Northeast with their children for approximately 13 years. On January 23 at 1:20 p.m., two children were at school and Rohen and Marty Brewer-Slater were at home with their adult daughter Eenone Johnson-McDonell and her boyfriend James Meline.

Parrish knocked on the door for approximately 15 minutes. Rohen did not open the door because he did not recognize Parrish or Thomas. Rohen decided to "crack the door open a little bit to ask them what they wanted." Thomas and Parrish asked if "Nessa" was there. Rohen did not recognize the name and told Parrish and Thomas the person they were looking for "w[as]n't in the home." Parrish then "shoved the muzzle of" his rifle through the opening and "pushed his way" into the house. Thomas and Parrish pointed their guns at Rohen, demanded "all of the computers and laptops in the home," and said if Rohen did not "do what they asked that they would kill me." Rohen yelled they had "picked the wrong home" and to "leave immediately." Rohen yelled "for my daughter and anybody in the home to call 911."

Rohen's daughter Eenone and her boyfriend James heard the shouting. James ran upstairs from the basement. Thomas pointed her gun at Rohen and James. Parrish went downstairs, pointed his rifle at Eenone's face, and told her, "Give me your phone." Parrish took her cell phone and went back upstairs. Meanwhile, Marty came running from the upstairs bedroom carrying bear mace. Rohen grabbed Thomas' pistol and threw it into the fireplace in the next room. Thomas ran out the front door. Parrish hit Rohen in the face with the butt of his rifle. Parrish aimed his rifle at Marty and pulled the trigger. Because the safety was on, the gun did not fire. Marty sprayed Parrish in the face with the bear mace. Rohen, James, and Eenone tried to wrestle the rifle away

6

from Parrish. Parrish dropped the rifle and ran. Rohen chased after Parrish. Rohen and James held Parrish until the police arrived.

Thomas called Dreewes at 1:49 p.m. Thomas was screaming and crying. She told Dreewes that "everything went wrong. . . . [W]e . . . went into the house, . . . they had gotten my gun. They . . . had Don." Dreewes told Thomas to go to Dreewes' mother's house but "[j]ust don't tell her mom why" Thomas was there and Dreewes "would be there soon." Dreewes told Thomas to "delete all the messages off [her] phone . . . [o]f any sorts of conversations that her and I had." Thomas decided to contact the police.

Detective Craig Bartl interviewed Thomas and Parrish. Detective Bartl obtained a search warrant for Thomas' cell phone records. Detective Bartl contacted Detective Paxton after learning Dreewes was involved. Detective Paxton called Dreewes. Dreewes agreed to give a recorded statement to the police.

The interview began at 8:15 p.m. on January 23. Dreewes denied asking Thomas to retrieve the stolen property. Dreewes said her nephew Kyle Becker told her a friend of his saw the pink-haired girl at a "drug house" with Dreewes' laptop and other stolen property. Dreewes said her husband drove to the house "to get the house number." Dreewes told the police she deleted all text messages with Thomas. Dreewes said she "didn't text that much with her. Most everything is on Facebook."

Detective Bartl obtained a warrant for the Facebook records. Facebook produced a 25-page printout of the Facebook messages between Dreewes and Thomas between January 14 and January 23, 2014.

7

The State charged Dreewes as an accomplice to the crime of burglary in the first degree while armed with a firearm and the crime of assault in the second degree with a deadly weapon of Marty Brewer-Slater. The information identifies Don Raymond Parrish and Michelle Joan Thomas as codefendants.

The affidavit of probable cause states Parrish and Thomas agreed to retrieve Dreewes' stolen property. Dreewes "told them that her stolen credit card, laptop, and phone were inside the residence and provided them with the address." Parrish admitted he was armed with a " 'big gun' " and Thomas with a " 'small gun' " and they forced their way into the house. The affidavit states Thomas gave Detective Bartl a recorded statement.

> Thomas provided a recorded statement after being advised again of her constitutional rights. Thomas stated that she and her boyfriend Parrish drove to the victims' residence to help Jennifer Dreewes recover a laptop, phone, and credit card stolen from Dreewes during a vehicle prowl. Thomas stated that Dreewes offered her $300 to get the stolen items back. Thomas said she sent Dreewes a text message upon arriving at the residence that said "in the neighborhood" in addition to other text messages sent earlier in the day. Thomas said Dreewes provided information about Vanessa and that Dreewes kept telling her that she needed the laptop.

> Thomas stated that they were looking for a girl named Ness or Vanessa. Thomas said they parked their vehicle around the corner from the house and walked to the house. Parrish was armed with the rifle connected to a harness hidden under his brown zip up jacket. Thomas was armed with the little chrome handgun with a pearl handle. Thomas stated that after knocking on the door, it was eventually opened by the male homeowner who told them that there was no one with the name of Ness at the residence. Thomas stated that she told Parrish "let's go."

A number of witnesses testified at trial, including the detectives, a firearms expert, Michelle Thomas, Rohen Brewer-Slater, and Marty Brewer-Slater. The court admitted into evidence over 60 exhibits, including Facebook and phone records, the 911

8

call, the videotaped interview with Dreewes, and a videotaped demonstration of a detective firing the pistol and the semiautomatic rifle.

Michelle Thomas testified that she communicated with Dreewes through Facebook messages, cell phone calls, and text messaging. Dreewes described the girl that stole property from her truck on Facebook as a "[s]kinny, white crackhead with pink hair" and asked if anyone knew her. Thomas "obtained a partial name and some pictures and . . . sent them" to Dreewes.

Thomas testified that at first, she and Dreewes talked about "giving [the pink-haired girl] a black eye and . . . hurting her," but "we were just joking around. Ha-ha, making light of the deal. Figuring that the detectives or whoever was on the case would finally eventually get it." But after Dreewes "offered $300 for us to find her and get her belongings back, that's when I was, like, Oh, wow, she's serious about it." Thomas said that as a single mother of two, she would do "[w]hatever I had to do" for the money.

Dreewes told Thomas her nephew Kyle was "absolutely positive that her belongings were in the house" across the street from the Marysville Pilchuck High School. Thomas testified that she told Dreewes, "We need to know exactly what you want done, because once we get there, . . . you cannot change your plans." Dreewes gave Thomas the address of the house and said, "My nephew says my laptop and stuff is 100% in that house." Thomas confirmed whether "all she wanted was her stuff back." Dreewes told Thomas she "wants her stuff, and she wanted [the pink-haired girl] to have two black eyes and to go to jail." Dreewes told Thomas to retrieve her belongings, give the girl "[b]lack eyes[,] and bring her to my barn" in Arlington.

9

Thomas asked Dreewes to confirm the address and "wanted to know how many people were in the home" and "if there was any sort of weapons."

> I had to ask her where the location was. We needed the address. We wanted to know how many people were in the home, if there was any sort of weapons, before we attempted to go to the home.
>
> Q  Why was it important to know if — the number of people in the home and whether or not there were any weapons in the home before you attempted to go to the home?
> A  We needed to know how many people were in the home so we know how many people we were going up against to see if it was even worth going in. Because if there was too many, we were going to call it off.
>      Weapons, we would just bring our own.
> Q  If there were weapons there, you would bring your own?
> A  Yep.

Dreewes confirmed the address was 10501 56th Drive Northeast and told Thomas that "there was four to five people in the house, and that we should not go unless we had weapons."

Thomas took a handgun and a backpack with duct tape and zip ties to use to bring the pink-haired girl to Dreewes' barn. Parrish was armed with a semiautomatic rifle. Before reaching the house, Thomas sent a text to Dreewes telling her "it was a huge neighborhood, and there were tons of people around." Dreewes "told us to [j]ust nab her and run."

Thomas testified that when a man answered the door, he told them, "Nobody's here by that name." When he starts to shut the door, Parrish "pushes the door back open." Thomas testified she and Parrish went inside with their "guns drawn" and shut the door. Thomas said that after the man knocked the gun out of her hand, she opened the door and "took off running." Thomas called Dreewes. Dreewes "told me to go to her mom's house and hide out" but "[j]ust don't tell her mom why I was sitting there and

waiting and that she would be there soon." Dreewes told Thomas to "delete all messages . . . [o]f any sorts of conversations that her and I had."

On cross-examination, Thomas said she pleaded guilty to burglary in the first degree and assault in the second degree with a firearm and "agreed to testify . . . truthfully" at trial. Thomas testified that in January 2014, she was using illegal drugs and during some of the conversations with Dreewes, she was "intoxicated on illegal drugs."

The Sprint records showed that between January 14 and January 23, Dreewes and Thomas exchanged 183 cell phone calls and text messages.[7] The Sprint records also showed that approximately an hour before Thomas and Parrish used guns to force their way into the Brewer-Slater home at 1:20 p.m. on January 23, Thomas called Dreewes, and that Dreewes sent a text message to Thomas at 1:46 p.m.

Without objection, a detective read portions of a printout of text messages between Thomas and Parrish to the jury. At approximately 2:00 p.m. on January 22, Thomas tells Parrish she has the address and "[t]ake the gun with you."

> Michelle responds [to Parrish] . . . . If you want the address, I . . . have it. Take the gun with you.
> Mr. Parrish responds back within a minute, Give to me.
> And then Michelle sends out, couple minutes later, . . . 56th Drive East Marysville, older Durango in the driveway. There are four to five people inside, all are packing. . . .
> Then Mr. Parrish responds a couple minutes later, Where did you . . . get info from? Reliable?
> Michelle responds, Yes. Jen's nephew was there.
> Mr. Parrish responds, couple minutes later, 500 still on the table?
> And response back to that is, $300 . . . . If police don't find out she got it back, she'll throw in extra.

---

[7] Exhibit 59 is an oversized poster-board chart showing the Sprint phone calls and text messages between Dreewes and Thomas.

By stipulation, the court also admitted a recording of a jail telephone conversation between Dreewes and an unidentified male. During the call, Dreewes asks the unidentified male to access her Facebook account and delete all messages with Thomas.

Rohen Brewer-Slater testified that he works in the aerospace industry. Rohen said that in January 2014, the family invited a homeless girl to spend the night at the house. Rohen described the girl as a white female with pink-dyed hair.

Marty Brewer-Slater testified she worked as a minister and previously worked in the medical profession. Marty said she and her family lived at 10501 56th Drive Northeast for 13 years. In 2014, Marty had stage 4 renal failure.

Marty testified that sometime in January 2014, a girl with pink hair "showed up at my front door with her nose broken and her face completely black and blue." Marty previously met the girl at the "church soup kitchen dinners." Marty let the girl stay at the house. Marty testified that she told the pink-haired girl to leave after the girl showed up with "a lot of bags suddenly." Marty also suspected the girl was "doing drugs" and smoking cigarettes in the house.

> Because the night after the first night, spending the night, I woke up and she had a lot of bags suddenly there. And I let her stay there one more night. And by the time the next day, I started smelling smells coming from downstairs, and I was pretty certain she was doing drugs downstairs. She was also smoking cigarettes which was a big rule in my house not to do.

Marty testified that on January 23, she was in the upstairs bedroom when she heard people in the house "screaming, Where's the laptops," followed by cursing and

yelling to call 911.

> I could hear people in the house screaming and asking for different names. Screaming for a Joe or a Tanya or a Tammy. Also screaming, Where's the laptops?
>
> And I heard a lot of cursing. My husband was screaming to get out of the house.
>
> And [James] saying as well, Get the fuck out of my house. It was a lot of yelling back and forth.
>
> And then suddenly I heard my daughter running downstairs and saying, Call 911. And I could hear somebody else run down the stairs as well.

Marty tried to call 911 but her cell phone was dead. Marty went to a hall closet to try to find a weapon. Thomas yelled from the bottom of the stairs, "Come out or I'm going to blow his fucking head off." Marty testified that she looked from behind the closet doorway and could see Thomas "waving the gun back and forth between James and my husband."

> I looked out the window to yell for help, but there was nobody out there. And I know that I have a fatal disease, and I knew the only way we were going [to] get out of that is if I came out fighting.

Marty ran to the bedroom and grabbed "grizzly bear mace." When Marty ran down the stairs with the bear mace, Rohen was able to get Thomas' gun and throw it in the fireplace.

> I ran down the stairs, and as I run down the stairs, the woman, she looks really surprised. And my husband — used that moment to grab the gun from her. And then threw it at the fireplace.

Marty testified that Parrish then "tries to shoot me in the face"—he "pointed [the rifle] directly at my face" and pulled the trigger—but the safety was on. Marty sprayed Parrish with almost the entire can of bear mace. Marty testified that "[a]fter I sprayed him in the face, I immediately lift the can up to spray the woman as well. And she turned and ran, and I got her in the back and on the side of her head." Marty said that

13

while Rohen, their daughter Eenone, and her boyfriend James "all tried to get the [rifle] away," Parrish was "trying to pull the trigger on all of us." Marty said Parrish "had a God-awful look on his face because it didn't go off. And he tried to put his hand onto the safety to take the safety off."

Lynn Knapp testified that she had lunch with Dreewes in Leavenworth on January 23, 2014. Dreewes "was on her phone the entire time, texting and [checking] Facebook." As they were leaving the restaurant, Dreewes' phone rang. Dreewes told Knapp, "Oh, shit. I got to take this." Knapp heard Dreewes ask, "What happened" and say, "Go to my mom's." Knapp testified that after the call ended, Dreewes was "laughing." Dreewes said the police were chasing "her friend that was helping her find the stuff that was taken from her truck," there was "a scuffle," "there was bear mace," and the "cops were chasing" the friend.

> After she hangs up, we're back at our pickups and the horses. And she's laughing and telling me that her friend that was helping her find the stuff that was taken from her truck — it was the wrong house or something.
> Anyways, there was — you know, a scuffle, and there was bear mace and she was running and — but she got caught. The cops were chasing her.

Dreewes said that in addition to getting her stolen property, "they were going to make sure that the bitch that ripped her off paid for it."

Without objection, the State played for the jury the videotaped interview with Dreewes on January 23. During the interview, Dreewes told the police her friend Michelle Thomas identified the girl with the pink hair and her telephone number.

> I don't know why she even was helping me. Well, I just figured that she would because she was the one that was . . . willing to help figure out who this girl was. And I was really happy that she was helping me figure out who this girl was. I was like, wow, somebody actually wants to help me.

14

. . . I told my husband if I don't get my stuff back, I don't get my stuff back. The point of it was . . . getting this girl in trouble. Hoping she didn't do it to someone else.

Dreewes told the police, "My insurance company already covered me" and denied ever asking anyone to retrieve her stolen property.

I was pretty upset. I didn't do anything, but I'm not that stupid. (Laughs.) . . . With all the information that I have gotten, . . . I would have to say I've been pretty . . . patient. I haven't gone into any houses, I haven't called any phone numbers . . . . But . . . my hands are tied. I have to let you guys do your job. (Laughs.) I will tell you I've been helping. (Laughs.)

Dreewes said Thomas later called to tell her that her boyfriend Parrish said the "girl knows. She's telling her friends she's gonna run." Dreewes admitted that she offered Thomas $300 for "information" and that Thomas sent her a picture on Facebook of a "silver gun." But Dreewes said Thomas "didn't tell me what . . . was going on." Dreewes admitted Thomas called her on January 23, "crying and screaming."

[W]hen [Thomas] was crying on the phone and I was trying to figure out what was going on I said what the hell happened. She didn't tell me what . . . was going on. . . . I'd gotten a text message from her that said there's a bunch of people here. And I said where. And that was the last I heard, she didn't send me anything else.

Dreewes said the Facebook and text messages would show that she only "wanted . . . information" and never asked Thomas "to do anything serious."

I would have never asked her to seriously do anything. And I told her that on the phone yesterday. I said I never asked you to do anything serious. I said alls [sic] I wanted was information, like when I got the phone number. That was it.

Dreewes said Thomas joked about "lots of things" and Dreewes "had no idea what was going on" on January 23.

[Thomas] did joke about lots of things like being a detective. . . . On Facebook she joked about being a bounty hunter. . . . I don't think that she would actually do anything stupid. . . . She made a joke that wouldn't it be

15

funny if we hung her in your arena. (Laughs.) . . . And I was like . . . oh that would be kinda funny, you know, but . . . not something I would ever do. I'm not a troublemaker. . . . I try to mind my p's and q's. . . . When she called me the other day, she was like, ooh, wouldn't this be cool if I was like a bounty hunter and I went and got her. And I was like, sure. But I would never actually ask somebody to go get someone for me.

Near the end of the interview, Detective Bartl told Dreewes that Thomas and Parrish told the police she offered to pay them money to retrieve her stolen property at 10501 56th Drive Northeast, they went to the house to get her stolen property, they "pulled guns on four people," and they "[t]hreatened to kill them."

So here's what we know. . . . Here's what we've been told. . . . That . . . you've offered Michelle and Don money to get your stuff back, they went to a house, and entered the house under the guise that you were gonna give them money at some point to get your stuff back. . . . They pulled guns on four people. Threatened to kill them. Unfortunately for them, the people who's house they went in fought back, and they left, OK. And they're under arrest. OK because you offered them money, and that's what they're telling us, you've deleted your messages. . . . So . . . what are we supposed to believe? That . . . maybe they're telling us the truth, right? . . . So that is solicitation because you asked—you've solicited their help to go do this.

Dreewes denied telling Thomas and Parrish to go to the house with guns to retrieve her property.

| Dreewes: | But I didn't ask them to do that. Never once did I ask them to do something stupid. |
| Detective Bartl: | You solicited them to go get your stuff back. And . . . by them going to do that, they committed robbery, burglary, and assault. As of now. |
| Dreewes: | (whispers) Oh my god. |
| Detective Bartl: | So because you offered them money to do this, you're just as guilty as they are. |
| Dreewes: | Absolutely. |

16

The jury found Dreewes guilty as an accomplice to the crime of burglary in the first degree as charged in count I. The jury found Dreewes guilty as an accomplice to the crime of assault in the second degree of Marty Brewer-Slater as charged in count II. By special verdict, the jury found Dreewes was armed with a firearm. The court imposed a 90-month sentence for burglary in the first degree while armed with a firearm and a concurrent 14-month sentence for assault in the second degree with a deadly weapon. The court ordered Dreewes to pay the mandatory $500 victim penalty assessment and $100 DNA fee.

## ANALYSIS

Dreewes seeks dismissal of the convictions. Dreewes asserts sufficient evidence does not support the conviction as an accomplice to the crime of burglary in the first degree while armed with a firearm or the crime of assault in the second degree with a deadly weapon of Marty Brewer-Slater. In the alternative, Dreewes seeks reversal and a new trial on the grounds that the court erred by admitting Facebook messages and that prosecutorial misconduct in closing argument deprived her of a fair trial. Dreewes also challenges imposition of the mandatory victim penalty and DNA fees.

Sufficiency of the Evidence

Dreewes argues sufficient evidence does not support finding her guilty as an accomplice because she had no knowledge that Thomas and Parrish would commit the crime of burglary in the first degree while armed with a firearm or the crime of assault in the second degree of Marty Brewer-Slater with a deadly weapon.

Under both the federal and the state constitution, due process requires the State to prove every element of the crime charged beyond a reasonable doubt. U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3; In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Winship, 397 U.S. at 364; State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). Sufficiency of the evidence is a question of constitutional law that we review de novo. Rich, 184 Wn.2d at 903.

Evidence is sufficient to support a conviction if any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. State v. Johnson, 188 Wn.2d 742, 750-51, 399 P.3d 507 (2017). A challenge to the sufficiency of the evidence admits the truth of the State's evidence. State v. Witherspoon, 180 Wn.2d 875, 883, 329 P.3d 888 (2014). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We defer to the trier of fact on "issues of witness credibility." Witherspoon, 180 Wn.2d at 883.

Accomplice Liability

A person is an accomplice in the commission of a crime if

[w]ith knowledge that it will promote or facilitate the commission of the crime, he or she
    (i) Solicits, commands, encourages, or requests such other person to commit it; or
    (ii) Aids or agrees to aid such other person in planning or committing it.

RCW 9A.08.020(3)(a).

In State v. Roberts, 142 Wn.2d 471, 510-11, 14 P.3d 713 (2000), the court held the language of the accomplice liability statute requires the State to prove that a defendant acts with the knowledge that his or her conduct would promote or facilitate the crime charged. "The language of the accomplice liability statute establishes a mens rea requirement of 'knowledge' of 'the crime.' " Roberts, 142 Wn.2d at 510 (quoting RCW 9A.08.020(3)(a)). The court held that the legislature "intended the culpability of an accomplice not extend beyond the crimes of which the accomplice actually has 'knowledge,' the mens rea of RCW 9A.08.020." Roberts, 142 Wn.2d at 511. The court noted the long-standing rule that an accomplice need not have knowledge of every element of the crime committed by the principal and general knowledge of the crime is sufficient. Roberts, 142 Wn.2d at 511-12. But the court held:

> [K]nowledge by the accomplice that the principal intends to commit "a crime" does not impose strict liability for any and all offenses that follow. Such an interpretation is contrary to the statute's plain language, its legislative history, and supporting case law.

Roberts, 142 Wn.2d at 513. For accomplice liability to attach, "a defendant must not merely aid in any crime, but must knowingly aid in the commission of the specific crime charged." State v. Brown, 147 Wn.2d 330, 338, 58 P.3d 889 (2002) (citing Roberts, 142 Wn.2d at 509-13).

In State v. Cronin, 142 Wn.2d 568, 579, 14 P.3d 752 (2000), the court reiterated the fact that an alleged accomplice knows the principal intends to commit "a crime" does not mean accomplice liability attaches for any and all offenses ultimately committed by the principal. The State must prove the defendant acted with actual knowledge that she

19

was promoting or facilitating the crime charged. Cronin, 142 Wn.2d at 579.

> In our judgment, in order for one to be deemed an accomplice, that individual must have acted with knowledge that he or she was promoting or facilitating the crime for which that individual was eventually charged.

Cronin, 142 Wn.2d at 579.[8]

The accomplice liability statute states that a person has actual knowledge if that person "has information which would lead a reasonable person in the same situation to believe" he or she was promoting or facilitating the crime charged. RCW 9A.08.010(1)(b)(ii). While the State must prove actual knowledge of accomplice liability, "it may do so through circumstantial evidence." State v. Allen, 182 Wn.2d 364, 374, 341 P.3d 268 (2015).

Criminal liability is the same whether the defendant acts as a principal or as an accomplice. State v. Carter, 154 Wn.2d 71, 78, 109 P.3d 823 (2005); State v. Silva-Baltazar, 125 Wn.2d 472, 480-81, 886 P.2d 138 (1994).

> If convicted as an accomplice, an individual is considered to have actually committed the crime on the basis that "[t]he liability of the accomplice is the same as that of the principal." State v. Graham, 68 Wn. App. 878, 881, 846 P.2d 578 (1993); see also State v. McDonald, 138 Wn.2d 680, 687-89, 981 P.2d 443 (1999); State v. Carothers, 84 Wn.2d 256, 264, 525 P.2d 731 (1974), disapproved on other grounds by State v. Harris, 102 Wn.2d 148, 685 P.2d 584 (1984).

Carter, 154 Wn.2d at 78.[9]

In State v. Teal, 152 Wn.2d 333, 339, 96 P.3d 974 (2004), the court held that because accomplice liability is not an element of the crime charged, "[t]he rule requiring that all elements of a crime be listed in a single instruction is not violated when accomplice liability is described in a separate instruction." Here, the court separately

---

[8] Emphasis in original.

[9] Alteration in original.

instructed the jury on accomplice liability. The court instructed the jury that Dreewes is guilty as an accomplice and legally accountable for the conduct of another person in the commission of the crime if with knowledge, she solicits, promotes, or facilitates the commission of the crime. The court instructed the jury as follows:

> A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.
> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
> (1) solicits, commands, encourages, or requests another person to commit the crime; or
> (2) aids or agrees to aid another person in planning or committing the crime.
> The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.
> A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

## Burglary in the First Degree While Armed with a Firearm Conviction

Dreewes contends sufficient evidence does not support the jury finding of accomplice liability of burglary in the first degree while armed with a firearm. Dreewes asserts the evidence does not show she knew Thomas and Parrish would commit the crime of burglary in the first degree by unlawfully entering the residence.

RCW 9A.52.020(1) defines the crime of burglary in the first degree. RCW 9A.52.020(1) states:

> A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

21

The information charging Dreewes as an accomplice to the crime of burglary in the first degree while armed with a firearm states:

> COUNT I:  FIRST DEGREE BURGLARY (FIREARM ALLEGATION), committed as follows:  That the defendant, on or about the 23rd day of January, 2014, with intent to commit a crime against a person or property therein, did enter and remain unlawfully in the building of Rohen Brewer-Slater, located at 10501 56th Avenue [sic] NE, Marysville, Washington, and in entering and while in such building and in immediate flight therefrom, the defendant or another participant in the crime was armed with a firearm, a deadly weapon; proscribed by RCW 9A.52.020, a felony; and that at the time of the commission of the crime, the defendant or an accomplice was armed with a firearm, as provided and defined in RCW 9.94A.533(3), RCW 9.41.010, and RCW 9.94A.825.

The to-convict jury instruction for the crime of burglary in the first degree states:

> To convict the defendant of the crime of burglary in the first degree as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1)  That on or about the 23rd day of January, 2014, the defendant entered or remained unlawfully in a building;
> (2)  That the entering or remaining was with intent to commit a crime against a person or property therein;
> (3)  That in so entering or while in the building or in immediate flight from the building the defendant or an accomplice in the crime charged was armed with a deadly weapon; and
> (4)  That the acts occurred in the State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
> On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

To convict Dreewes as an accomplice to the crime of burglary in the first degree, the State had the burden of proving beyond a reasonable doubt Dreewes had actual knowledge that she was promoting or facilitating the crime of unlawfully entering with intent to commit a crime against a person or property.  Roberts, 142 Wn.2d at 510-11; Cronin, 142 Wn.2d at 579; Allen, 182 Wn.2d at 374.

22

Viewing the evidence in the light most favorable to the State, the evidence and reasonable inferences support finding Dreewes knew Thomas and Parrish would unlawfully enter the residence located at 10501 56th Drive Northeast to commit a crime against a person or property while armed with a firearm. Dreewes solicited and agreed to pay Thomas and Parrish to go to that address to retrieve her property and bring the pink-haired girl to her barn. On January 22, Dreewes confirmed the address of the house was 10501 56th Drive Northeast and told Thomas, "My nephew says my laptop and stuff is 100% in that house." Dreewes said, "If you get my laptop back and cops don't know about it I can keep the $1500 and get you some more $$." Dreewes told Thomas there were four to five people in the house and instructed Thomas and Parrish to go to the house armed with firearms to retrieve her property and "nab" the pink-haired girl. Dreewes told Thomas, "[D]on't go there unless packing." Thomas testified that she and Parrish "needed to know how many people were in the home so we know how many people we were going up against." Dreewes told Thomas, "I want my shit," "I want [the pink-haired girl] to have 2 black eyes," and to bring the pink-haired girl to her barn in Arlington. The undisputed evidence establishes Parrish and Thomas used the firearms Dreewes told them to bring to force their way into the residence to commit a crime against "a person or property therein."

We hold sufficient evidence supports the jury conviction of Dreewes as an accomplice to the crime of burglary in the first degree while armed with a firearm.

### Assault in the Second Degree with a Deadly Weapon Conviction

Dreewes contends sufficient evidence does not support the jury conviction of accomplice to the crime of assault in the second degree with a deadly weapon of Marty

Brewer-Slater. Dreewes concedes the evidence supports accomplice liability for "attempted assault of the suspected thief" or of another with a firearm. But Dreewes asserts the State did not prove accomplice liability for the crime of assault in the second degree of Marty Brewer-Slater.[10]

A person commits assault in the second degree if he or she "[a]ssaults another with a deadly weapon." RCW 9A.36.021(1)(c). The information charged Dreewes with the crime of assault in the second degree with a deadly weapon of Marty Brewer-Slater.

> COUNT II: SECOND DEGREE ASSAULT, committed as follows: That the defendant, on or about the 23rd day of January, 2014, did intentionally assault another person, to-wit: Marty Brewer-Slater, with a deadly weapon, to-wit: a firearm; proscribed by RCW 9A.36.021(1)(c), a felony.

The court instructed the jury that "[a] person commits the crime of assault in the second degree when he or she assaults another with a deadly weapon."[11] Instead of using the language "assaults another," the to-convict jury instruction specifically identifies the assault of "Marty Brewer-Slater" with a deadly weapon. Jury instruction 15 states:

> To convict the defendant of the crime of assault in the second degree as charged in Count II, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about the 23rd day of January, 2014, the defendant assaulted Marty[ ] Brewer Slater with a deadly weapon; and
> (2) That this act occurred in the State of Washington.

---

[10] Following oral argument, we asked the parties to submit supplemental briefing to address the law of the case doctrine in State v. Hickman, 135 Wn.2d 97, 954 P.2d 900 (1998), and the recent Washington State Supreme Court decision in Johnson, 188 Wn.2d at 742.

[11] The jury instructions define "assault" as follows:

An assault is an act done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.

An assault is also an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

If you find from the evidence that each of these elements have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any of these elements, then it will be your duty to return a verdict of not guilty.[12]

Dreewes asserts that under the law of the case doctrine, the evidence does not support the conviction as an accomplice to the crime of assault in the second degree with a deadly weapon of Marty Brewer-Slater. The State claims the law of the case doctrine does not apply because accomplice liability is not an element of the crime and an accomplice need not have specific knowledge of every element of the crime committed by the principal. The State asserts the evidence supports the conviction "even if there is no evidence" Dreewes knew the specific person assaulted. We disagree with the State.

Under the law of the case doctrine, unless the State objects, the to-convict instruction defines the essential elements of the crime and dictates the elements of the crime for purposes of sufficiency review. Johnson, 188 Wn.2d at 760; State v. Hickman, 135 Wn.2d 97, 102, 954 P.2d 900 (1998). The State assumes the burden of proving beyond a reasonable doubt otherwise unnecessary elements that are included without objection in the to-convict instruction. Johnson, 188 Wn.2d at 760. The law of the case doctrine is based on the premise that a jury instruction is binding and conclusive and the State must prove "otherwise unnecessary elements" included in the to-convict instruction. Hickman, 135 Wn.2d at 101-02. When the State adds an unnecessary element to a to-convict instruction and the jury convicts, the unnecessary element must be supported by sufficient evidence. Johnson, 188 Wn.2d at 760; Hickman, 135 Wn.2d

---

12 Emphasis added.

25

at 102. In determining whether there is sufficient evidence to prove the added element, the court asks whether after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the element beyond a reasonable doubt. Hickman, 135 Wn.2d at 103. If insufficient evidence proves the added element, reversal is required. Hickman, 135 Wn.2d at 103.

There is overwhelming evidence that Dreewes was guilty as an accomplice of assault in the second degree with a deadly weapon of another. But because the to-convict jury instruction specifically identifies Marty Brewer-Slater and the State did not object to the jury instruction, under the law of the case doctrine, the State assumed the burden to prove beyond a reasonable doubt that Dreewes acted with the knowledge that she was promoting or facilitating the specific crime of assault in the second degree with a deadly weapon of Marty Brewer-Slater. No evidence supports finding Dreewes had actual knowledge of assault in the second degree of Marty Brewer-Slater with a deadly weapon. Because sufficient evidence does not support the conviction as an accomplice to assault in the second degree of Marty Brewer-Slater, we reverse the conviction and remand to dismiss.

Because the remainder of this opinion has no precedential value, the panel has determined it should not be published in accordance with RCW 2.06.040.

<u>Authentication of Facebook Messages</u>

Dreewes contends the court erred by admitting the Facebook messages she exchanged with Thomas, "Exhibit 52." Exhibit 52 contains the Facebook communications between Dreewes and Thomas with data fields identifying date and time "sent," "recipients," and "author." Thomas testified that the messages represent an

"accurate account of the conversation[s]" with Dreewes "and things that were going to be done to recover her items." Over the objection of the defense, the court admitted Exhibit 52.

During further questioning about Exhibit 52, Thomas testified about the accuracy of the exhibit and the Facebook messages.

> Q But is your testimony that those particular timestamps in the exhibit you're holding are accurate?
> A I would say so.
> Q And do you recall these statements independently of looking at that document?
> A I remember a majority of everything. It's been almost two years now, so . . .
> Q So would you say that your recollections are just kind of vague recollections of kind of what was said, or are you saying that you remember exactly word for word what was said?
> A No. I do not remember what — what was said word by word.[13]

The court overruled the renewed objection to admission of Exhibit 52.

We review the trial court's evidentiary rulings for abuse of discretion. State v. Garcia, 179 Wn.2d 828, 846, 318 P.3d 266 (2014). " 'A trial court abuses its discretion if its decision is manifestly unreasonable or based upon untenable grounds or reasons.' " Garcia, 179 Wn.2d at 846[14] (quoting State v. Lamb, 175 Wn.2d 121, 127, 285 P.3d 27 (2012)).

Dreewes claims Thomas did not authenticate the Facebook messages. Authentication is a preliminary matter subject to ER 104. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." ER 901(a). ER 901 does not limit the type of evidence allowed to authenticate

---

[13] Boldface in original; alteration in original.
[14] Internal quotation marks omitted.

a document. The requirement under ER 901(a) is met " 'if sufficient proof is introduced to permit a reasonable trier of fact to find in favor of authentication or identification.' " State v. Bradford, 175 Wn. App. 912, 928, 308 P.3d 736 (2013) (quoting State v. Danielson, 37 Wn. App. 469, 471, 681 P.2d 260 (1984)). The proponent " 'need not rule out all possibilities inconsistent with authenticity or conclusively prove that evidence is what it purports to be.' " In re Det. of H.N., 188 Wn. App. 744, 751, 355 P.3d 294 (2015)[15] (quoting State v. Andrews, 172 Wn. App. 703, 708, 293 P.3d 1203 (2013)). " 'Once a prima facie showing has been made, the evidence is admissible under ER 901.' " State v. Young, 192 Wn. App. 850, 855, 369 P.3d 205 (2016)[16] (quoting H.N., 188 Wn. App. at 751-52).

ER 901(b) cites specific circumstances that meet the requirements of authentication:

> **Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
> (1) <u>Testimony of Witness With Knowledge.</u> Testimony that a matter is what it is claimed to be.
> . . . .
> (4) <u>Distinctive Characteristics and the Like.</u> Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.
> . . . .
> (10) <u>Electronic Mail (E-mail).</u> Testimony by a person with knowledge that (i) the email purports to be authored or created by the particular sender or the sender's agent; (ii) the email purports to be sent from an e-mail address associated with the particular sender or the sender's agent; and (iii) the appearance, contents, substance, internal patterns, or other distinctive characteristics of the e-mail, taken in conjunction with the circumstances, are sufficient to support a finding that the e-mail in question is what the proponent claims.[17]

---

[15] Internal quotation marks omitted.

[16] Internal quotation marks omitted.

[17] Boldface in original; emphasis in original.

Dreewes contends that because Thomas could not independently recall the contents of the Facebook messages and testified she did "not remember . . . what was said word by word," the requirements of ER 901 are not met. We disagree.

We consider not only the testimony of Thomas as one of the participants but also the "contents, substance, internal patterns, or other distinctive characteristics of the e-mail" to determine whether the Facebook messages represent what the proponent claims. ER 901(b)(1), (10). Here, the testimony established the Facebook messages included distinctive characteristics, including date, time, names, and content, and were what they purported to be. Thomas testified the messages were sent using her Facebook account address to Dreewes' Facebook account address. Thomas testified Exhibit 52 reflected the conversations she had with Dreewes about the stolen property and was an "accurate account" of the conversations she had with Dreewes. The distinctive characteristics of the communications and timing of the messages also support the conclusion that the State established authentication. The trial court did not abuse its discretion by admitting Exhibit 52.

Prosecutorial Misconduct

Dreewes argues prosecutorial misconduct during closing argument deprived her of the right to a fair trial. To prevail on a claim of prosecutorial misconduct, a defendant must show the conduct was both improper and prejudicial. State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). We review allegedly improper comments in the context of the entire closing argument, the issues presented, the evidence, and the instructions given to the jury. State v. Russell, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994).

Dreewes claims the prosecutor committed misconduct in closing argument by telling the jury the State could have charged Dreewes with "three more counts of assault in the second degree." The prosecutor argued:

> And Count II, I'm just going to go over that real quick: Person commits the crime of assault in the second degree — this is Instruction Number 14 — when he or she assaults another with a deadly weapon.
> Instruction 5 tells you what it is. Count I, That on or about the 23rd day of January 2014, the defendant assaulted Marty Brewer-Slater with a deadly weapon.
> Did she do that? Yes. Because when Don Parrish, who is her accomplice, is squeezing the trigger right there in her face with a safety on . . . A deadly weapon, the instruction also tells you in a different instruction, is a firearm.
> Now, recall that we just charged the crime of assault in the second degree for Marty Brewer. The State would have charged the crime of assault in the second degree for everybody in that house.
> We could have added three more counts of assault in the second degree, because when you think about an assault — and I tell you this because you're going to say, Well, were other people assaulted in the house based on that definition?
> Yes. But the counts that you've been charged with, that you're to determine, is Marty Brewer-Slater alone.[18]

Defense counsel did not object to the argument. If the defendant does not object at trial, any error is waived unless the conduct is "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760-61.

> Under this heightened standard, the defendant must show that (1) "no curative instruction would have obviated any prejudicial effect on the jury" and (2) the misconduct resulted in prejudice that "had a substantial likelihood of affecting the jury verdict."

Emery, 174 Wn.2d at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

In context, Dreewes cannot show prosecutorial misconduct. The undisputed evidence at trial established Parrish and Thomas pointed their guns not only at Marty

---

[18] Alteration in original.

Brewer-Slater, but also at Rohen Brewer-Slater, their daughter Eenone, and her boyfriend James. But the prosecutor argued the only count of assault the jury should consider was the assault of Marty Brewer-Slater.

Even if misconduct, Dreewes cannot show a curative instruction would not have obviated any prejudice. Emery, 174 Wn.2d at 760-61. State v. Boehning, 127 Wn. App. 511, 111 P.3d 899 (2005), is distinguishable. Unlike in Boehning, the prosecutor did not refer repeatedly to uncharged crimes to bolster the victim's credibility or imply the jury should find Dreewes guilty of uncharged crimes.

Imposition of Mandatory Fees

Dreewes challenges the imposition of the mandatory $500 victim penalty assessment under RCW 7.68.035(1)(a) and the mandatory $100 DNA fee under RCW 43.43.7541.

Dreewes argues the court must consider her ability to pay before imposing the victim penalty assessment and the DNA fee. We disagree. "[U]nlike discretionary legal financial obligations, the legislature unequivocally requires imposition of the mandatory DNA fee and the mandatory victim penalty assessment at sentencing without regard to finding the ability to pay." State v. Shelton, 194 Wn. App. 660, 673-74, 378 P.3d 230 (2016); State v. Mathers, 193 Wn. App. 913, 917-924, 376 P.3d 1163 (2016) (holding RCW 10.01.160(3) does not require trial courts to consider defendant's ability to pay before imposing victim penalty assessment and the DNA database fee).

Dreewes also contends that allowing waiver of mandatory fees for civil litigants but not for criminal defendants violates equal protection. In Mathers, we considered and rejected the same argument. Mathers, 193 Wn. App. at 924-29. In Mathers, we

held imposition of the mandatory victim penalty assessment and DNA fee does not violate equal protection because civil litigants and criminal defendants are not similarly situated individuals receiving disparate treatment. Mathers, 193 Wn. App. at 926. We also concluded imposition of the victim penalty assessment and DNA fee does not violate substantive due process because the defendant will not be incarcerated for failure to pay the fees unless the violation is willful. Mathers, 193 Wn. App. at 928. We adhere to Mathers and conclude the trial court did not err in imposing mandatory fees.

We affirm the conviction of Dreewes as an accomplice to the crime of burglary in the first degree while armed with a firearm but reverse the conviction as an accomplice to the crime of assault in the second degree with a deadly weapon of Marty Brewer-Slater, and remand to dismiss.[19]

WE CONCUR:

_Schindler, J._

_Trickey, A.C.J._                    _Cox, J._

---

[19] Dreewes asks us to deny appellate costs if the State claims it is entitled to costs as the substantially prevailing party. RAP 14.2. Where a trial court makes a finding of indigency, that finding remains throughout review "unless the commissioner or clerk determines by a preponderance of the evidence that the offender's financial circumstances have significantly improved since the last determination of indigency." RAP 14.2. Under RAP 14.2, the State may file a motion for costs if financial circumstances have significantly improved since the finding of indigency. State v. St. Clare, 198 Wn. App. 371, 382, 393 P.3d 836 (2017).