IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36001-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JUAN JOSE LUNA HUEZO, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Juan Luna Huezo appeals from convictions for raping and molesting two stepdaughters. He challenges the sufficiency of evidence. He also claims the trial court committed error when permitting the stepdaughters to answer some questions in writing and when excluding testimony from family members of his sexual morality and decency. We find no error and affirm.

FACTS

We gather our facts from trial testimony. We expand on some of the facts when describing the case's procedure.

Juan Luna Huezo is the stepfather of Tammy, born April 5, 2005, and Bonnie, born July 31, 2006, both pseudonyms. The girl's mother began dating Luna Huezo in

November 2009 and married him in January 2010. Luna Huezo is more than two decades older than the girls.

At age nine, Tammy became the subject of sexual abuse by Juan Luna Huezo. Luna Huezo began sexually abusing Bonnie when she was eight years old.

At trial, Tammy testified that Juan Luna Huezo sexually touched her on several occasions and in multiple locations in Kennewick, including at an apartment her family rented at the Hawaiian Village Apartments, at her family's home on Steptoe Street, at her aunt Niashia Morales Enriquez's residence, and in a vehicle. The sexual touching included Luna Huezo placing his hand on Tammy's private parts, placing his private parts against her body, and placing his penis inside her mouth.

Tammy further testified that Juan Luna Huezo tied her hands behind her back with duct tape. Luna Huezo obtained a condom from a blue and gray backpack in the bathroom and placed it on his penis. Luna Huezo also rubbed oil on his penis. During trial, Luna Huezo confirmed that he used condoms and oil when engaging in sexual activity.

According to Tammy, Juan Luna Huezo also sexually abused her sister. Once Tammy asked Luna Huezo whether he was "doing the same thing [to Bonnie]," and he responded that he was. Report of Proceedings (RP) at 271.

Bonnie testified that Juan Luna Huezo touched her private area once. Bonnie further testified that she witnessed Juan Luna Huezo touch Tammy's private parts while

2

Tammy slept at the Steptoe house. Bonnie witnessed Luna Huezo take Tammy into his bedroom, at which time she heard Tammy crying.

On February 8, 2017, friends of eleven-year-old Tammy saw her crying during fifth grade music class. After speaking with Tammy, her friends informed their teacher about their concerns. Tammy's teacher then contacted Sarah McMullin, the school counselor, who spoke with Tammy.

Tammy and her ten-year-old sister, Bonnie, disclosed to Sarah McMullin that Juan Luna Huezo sexually abused them. McMullin contacted the Kennewick Police Department. On February 8, 2017, Mauri Murstig, a forensic child interviewer at the Sexual Advocacy Response Center, interviewed both children.

On the night of February 8, 2017, Kennewick Police Department Detective Jose Santoy obtained warrants to search Tammy and Bonnie's home and the residence of their aunt, Niashia Morales Enriquez. Police found condoms, duct tape, zip ties, and a zebra blanket. Law enforcement neither preserved nor tested the blanket for DNA.

At some unidentified date, Dr. Shannon Phipps, later a trial witness, examined Tammy. Tammy was fearful and withdrawn while relating her history to Dr. Phipps. Tammy informed the physician that "she [Tammy] was too small," such that Juan Luna Huezo's penis did not fit inside her. RP at 161. Dr. Phipps' found no physical abnormalities in Tammy.

PROCEDURE

The State of Washington charged Juan Luna Huezo with one count of rape of a child in the first degree for conduct involving Tammy and three counts of child molestation in the first degree, with one count involving Tammy and two counts involving Bonnie. The one count of rape of a child in the first degree and the first count of child molestation in the first degree alleged aggravating circumstances of an ongoing pattern of sexual abuse and breach of a position of trust. The second count of child molestation in the first degree alleged the aggravating circumstance of violation of a position of trust.

During a pretrial interview with defense counsel, Tammy disclosed that sexual contact imposed by Juan Luna Huezo occurred fifty-eight times at the Hawaiian Village apartment and that her mother was home on about thirty of the occasions. Tammy also disclosed that sexual contact occurred twenty times at Niashia Morales Enriquez's residence and thirty times at the Steptoe house.

Before trial, the trial court granted the State's motion in limine precluding a witness from assessing the credibility of another witness. Also at the beginning of trial, the court entertained the State's motion to exclude character and reputation evidence. Juan Luna Huezo intended to have four witnesses testify to his sexual morality and decency: his ex-spouse, Laura Martinez; his daughter, Alexis Huezo; and his two sisters-in-law, Nancy Morales Enriquez and Niashia Morales Enriquez. The trial court allowed

4

Luna Huezo to present offers of proof before ruling on the State's motion to exclude the family member's testimony. During the offer of proof, Luna Huezo did not ask Alexis Huezo questions regarding his reputation for sexual morality. He conceded that he failed to establish a sufficient foundation for Nancy Morales Enriquez and Niashia Morales Enriquez to testify to his reputation in the community. The trial court denied any testimony from the four witnesses as to Luna Huezo's morality.

During her testimony, the State asked Tammy to describe Juan Luna Huezo's penis. Tammy did not respond. The State then asked Tammy whether she would prefer to write her answer, to which Tammy nodded affirmatively. Defense counsel objected to a written answer, but the trial court overruled the objection. Tammy's written answer read, "It was long and tiny hair." RP at 264. Defense counsel cross-examined Tammy, but did not question her about the one written answer.

During trial, Tammy did not testify to the the number of times of sexual contact she earlier reported to defense counsel. Rather, she testified that Juan Luna Huezo touched her privates one time at the Hawaiian Village apartment, put his penis against her vagina more than once at the Hawaiian Village apartment, and touched her vagina one time at Niashia Morales Enriquez's residence.

Bonnie testified with difficulty during trial. Bonnie did not answer some questions and responded to other questions with "I don't know" or "I don't remember." RP at 216-44. Bonnie testified that Juan Luna Huezo touched her private part on one

5

occasion.

Bonnie did not respond to a State's question of why she did not tell her mother about her stepfather's conduct. When she hesitated to answer, the State asked Bonnie to write her answer. The trial court overruled defense counsel's objection to a written answer. The court commented:

> This child is 11 and has been on the stand since a little after 11 o'clock. It's now 11:28. This witness is clearly having a difficult time responding and answering to questions. . . .

RP at 228. Bonnie wrote that she did not tell her mother because she thought her mother would not believe her.

When the State asked Bonnie why she did not inform her mother about Tammy's crying while being molested by Juan Luna Huezo, Bonnie replied that she was scared. When asked by the State why she was scared, Bonnie did not respond. Bonnie wrote her response over the defense's objection. The State showed Bonnie's response to the jury. Our record does not include the response. Defense counsel chose not to cross-examine Bonnie.

During trial, the forensic child interviewer, Mauri Murstig, explained the concept of episodic memory versus script memory:

> [A]sking a child who has experienced that [sexual abuse] for a long period of time, you know, they're not going to be able to give you an exact number that happened over months or years. And so, you know, what we try to do is just one time, more than one time and then try to get them to provide as many, you know, if there were specific times they could

6

remember, specific episodes, we try to focus on that. But, you know, it's going to be impossible to have them describe every time something happened, if it happened, you know, over a long period of time.

RP at 132.

Dr. Shannon Phipps, D.O. testified about the physical examination she conducted on Tammy. The State's attorney questioned Phipps: "because you don't find any kind of physical manifestations in her body, does that mean that no sexual abuse occurred?" RP at 154. Dr. Phipps answered:

> No, it doesn't. The body is incredible for healing. And I would relate this back to the example that I gave between an acute and a non-acute visit.
> If you're walking down the street and you twist your knee. You might have some swelling initially. If you go immediately for something, that might be perceived. Whereas if you wait three or four days, the swelling may have resolved, there may not be a physical finding yet the injury still occurred, so the body can heal.

RP at 154. Phipps averred that she would not expect to see tears or lesions in the vaginal area if a penis rubbed against the area, rather than entered the vagina. Finally, Dr. Phipps declared that "[i]t's more typical not to find findings than to find findings" in sexual assault exams. RP at 161.

Kennewick Police Department Detective Jose Santoy testified during trial. He explained the reason for not testing or preserving for evidence the zebra blanket.

> [T]he blanket, like I said, it was in a general area of the bedroom and any of the children could have touched it, to include the defendant and the victims.

7

RP at 205. After resting its case at trial, the State dismissed count 4, a child molestation charge involving Bonnie.

Juan Luna Huezo testified on his behalf. He denied any inappropriate sexual contact with either Tammy or Bonnie. During cross-examination, the State asked:

> Isn't it true during that interview you told Detective Santoy that [Tammy] would never lie about anything this serious; isn't that true?

RP at 401. On defense counsel's objection and the trial court's overruling the objection, the State proceeded to ask the question two more times, once about Tammy and once about Bonnie. The State also asked Luna Huezo about his comment about Tammy's hygiene issues the morning of his arrest:

> This is the first we're hearing about all this; Isn't that true?

RP at 399.

Trial defense counsel suffered the death of his niece during the trial. In response to the niece's death, counsel stated that "a brief continuance would be sufficient" in order to ensure his effectiveness at trial. RP at 105. The trial court granted a one-day recess for counsel to rest before continuing with trial. On return from the one-day recess, trial counsel made no further mention of his need for additional continuances. Trial counsel had tragically lost three siblings to cancer in the thirteen months preceding his niece's death.

During summation, the State's attorney commented:

> [Juan Luna Huezo] took the stand and he told you, . . . [t]hat there is also this thing that happened the morning of 2-8 where Tammy witnessed him pulling Bonnie's hair. . . . And something about Tammy not wiping herself.
> You know what's interest? Think about this.
> No question was ever asked of Kelly about any of that. Huh. Don't you think that's weird? No question was asked of Bonnie about any of that. None of that was mentioned in opening statement. Why is that? Because it only came in through him. Nobody else was asked about any of that. Think about that. Why? Because it's not true.

RP at 463-64. The prosecuting attorney added:

> He [Juan Luna Huezo] waited an entire year to now tell his side. Didn't tell it that day. Maybe he's had some time to think about it.

RP at 464.

The jury found Juan Luna Huezo guilty on all three counts and further found the presence of the aggravating circumstances.

## LAW AND ANALYSIS

On appeal, Juan Luna Huezo asserts the State presented insufficient evidence to convict him of any of the three crimes. He also assigns error to the trial court's permission to Tammy and Bonnie to write answers to some of the State's questions and to the trial court's exclusion of testimony about his sexual morality and decency.

### Right to Confrontation

Juan Luna Huezo asserts that the trial court denied him his right to confront Tammy and Bonnie as witnesses when it permitted each to testify via writing. He maintains that written answers limited his scope of cross-examination. He adds that the

9

trial court should have found the witnesses unavailable before allowing them to write their responses.

The State responds that the trial court did not breach Juan Luna Huezo's confrontation rights because Luna Huezo still had the opportunity to cross-examine each witness regarding her written answers. According to the State, the trial court placed no limits on the cross-examination. We agree with the State.

The United States Constitution states that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." U.S. CONST. amend. VI. The Washington State Constitution provides the accused the right "to meet the witnesses against him face to face." CONST. art. I, § 22. The Washington State Supreme Court applies the state constitution clause consistent with the reading of the federal confrontation clause. *State v. Lui*, 179 Wn.2d 457, 469, 315 P.3d 493 (2014).

The confrontation clause primarily secured the right of cross-examination. *State v. Foster*, 135 Wn.2d 441, 456, 957 P.2d 712 (1998). An impermissible limitation on the scope of cross-examination violates a defendant's right to confrontation. *State v. Garcia*, 179 Wn.2d 828, 844, 318 P.3d 266 (2014). The confrontation clause is generally satisfied, however, "'if defense counsel receives wide latitude at trial to question witnesses.'" *State v. Dye*, 170 Wn. App. 340, 346, 283 P.3d 1130 (2012) *aff'd* 178 Wn.2d 541, 309 1109 (2013) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 53, 107 S. Ct

989, 94 L. Ed. 2d 40 (1987)). The trial court placed no limit on Juan Luna Huezo's counsel cross-examining Tammy and Bonnie as to their written answers to questions.

Juan Luna Huezo cites no authority to support his contention that written answers to the State's questions violate the confrontation clause. We note that the State may introduce as an exhibit various writings, without breaching the confrontation clause, even though the content of the writing inculpates the accused. *Miller v. Stovall*, 742 F.3d 642, 651 (6th Cir. 2014); *State v. Price*, 154 Wn. App. 480, 491, 228 P.3d 1276 (2009). In *State v. Thomas H.*, 101 Conn. App. 363, 369-70, 922 A.2d 214 (2007), the reviewing court found no confrontation clause violation when the trial court permitted a child victim to provide a written answer to a question asked by the state on direct examination in a sexual assault trial, which question asked what happened after defendant ordered her to get in bed with him. The writing of the response occurred in the presence of the defendant during trial, and defendant was given the opportunity to cross-examine the victim regarding the response.

ER 611(a) provides:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

This rule impliedly grants the trial court authority to permit a witness to answer a question in writing to prevent embarrassment and to effectuate ascertainment of the truth.

11

A girl could understandably be embarrassed when asked to describe a man's penis.  The court also possessed the authority to permit some written answers from Bonnie after she had sat in the witness stand for twenty-five minutes and encountered difficulty answering.

Evidence of Sexual Morality and Decency

Juan Luna Huezo next asserts that the trial court erred by excluding evidence of his sexual morality and decency.  He argues that the trial court applied the wrong analysis when requiring a foundation to establish a community perception of morality.

We review the trial court's ruling on admissibility of evidence for abuse of discretion.  *State v. Woods*, 117 Wn. App. 278, 280, 70 P.3d 976 (2003).  Generally, evidence of a person's character is inadmissible, but a criminal defendant may present evidence of a "pertinent trait of character."  ER 404(a)(1).  In cases involving sexual offenses, sexual morality is a pertinent character trait.  *State v. Woods*, 117 Wn. App. at 280; *State v. Harper*, 35 Wn. App. 855, 859-60, 670 P.2d 296 (1983).

ER 405 controls the methods of proving a person's character.  The rule declares:

> **(a) Reputation.**  In all cases in which evidence of character or a trait of character of a person is admissible, proof *may be* made by testimony as to reputation.  On cross examination, inquiry is allowable into relevant specific instances of conduct.

(Emphasis added.)  Although the rule does not state that inquiry into a person's character *shall be* by testimony to reputation, Washington follows the traditional common law rule

12

that proof of character is limited to testimony concerning reputation. Rule 405. Methods

of Proving Character, 5D KARL B. TEGLAND, WASHINGTON PRACTICE: COURTROOM

HANDBOOK ON WASHINGTON EVIDENCE ER 405 author's cmt. 405:1 (2020 ed.). One

cannot express a personal opinion as to a witness's veracity. *State v. Woodard*, 26 Wn.

App. 735, 738, 617 P.2d 1039 (1980).

A party seeking to admit evidence bears the burden of establishing a foundation

for that evidence. *State v. Land*, 121 Wn.2d 494, 500, 851 P.2d 678 (1993). One

Washington Court of Appeals case stands for the proposition that, in order to offer

reputation testimony, a witness must lay a foundation establishing that he or she bases the

subject's reputation on perceptions in the community. *State v. Thach*, 126 Wn. App. 297,

315, 106 P.3d 782 (2005), *overruled on other grounds by State v. Case*, 13 Wn. App. 2d

657, 466 P.3d 799 (2020). A Washington Supreme Court decision reads that, to establish

a valid community, the party seeking to admit the reputation evidence must show that the

community is both neutral and general. *State v. Land*, 121 Wn.2d 494, 500 (1993).

ER 405 does not limit the reputation to the person's residential neighborhood. The

witness can testify to a reputation among business associates or coworkers. *State v.

Land*, 121 Wn.2d 494, 500-01 (1993); *State v. Callahan*, 87 Wn. App. 925, 936, 943 P.2d

676 (1997). Nevertheless, as already stated, to be admissible, the reputation must exist

within a "neutral and generalized community." *State v. Gregory*, 158 Wn.2d 759, 805,

147 P.3d 1201 (2006), *overruled on other grounds by*, *State v. W.R., Jr*, 181 Wn.2d 757,

336 P.3d 1134 (2014); *State v. Callahan*, 87 Wn. App. at 934. Reputation among a limited group of persons may not accurately reflect the witness's general character for truthfulness. Rule 405. Methods of Proving Character, 5D TEGLAND, *supra*, ER 405 author's cmt. 405:2.

A person's reputation among members of a family is inadmissible. *State v. Thach*, 126 Wn. App. 297, 315. A "family is not 'neutral enough [and] generalized enough to be classed as a community.'" *State v. Thach*, 126 Wn. App. at 315 (alteration in original); *State v. Lord*, 117 Wn.2d 829, 874, 822 P.2d 177 (1991). In *State v. Gregory*, 158 Wn.2d 759, 805, 147 P.3d 1201 (2006), the Supreme Court affirmed the trial court's exclusion of testimony of the victim's family members as to the victim's reputation of honesty among family. The Washington Supreme Court noted:

> First, the inherent nature of familial relationships often precludes family members from providing an unbiased and reliable evaluation of one another. In addition, the "community" with which Larson had discussed R.S.'s reputation included only two people, Larson and R.S.'s sister. Any community comprised of two individuals is too small to constitute a community for purposes of ER 608.

*State v. Gregory*, 158 Wn.2d at 805.

Juan Luna Huezo argues that the trial court erred because the court focused on his reputation rather than on whether the trait of sexual morality was pertinent to the underlying crimes. He contends that laying a foundation for community perception is not required to introduce evidence of sexual decency. He relies on *State v. Woods*, 117 Wn.

14

App. 278 (2003) and *State v. Griswold*, 98 Wn. App. 817, 991 P.2d 657 (2000),

*abrogated on other grounds by State v. DeVincentis*, 150 Wn.2d 11, 74 P.3d 119 (2003).

Neither case stands for this proposition. In both decisions, this court affirmed the

exclusion of testimony of the accused's decency because of the failure to properly proffer

reputation testimony.

Juan Luna Huezo wished for his ex-wife, his daughter, and his two sisters-in-law

to testify to his reputation for sexual morality. With offers of proof, Luna Huezo only

qualified a sister-in-law with any knowledge of any reputation for sexual decency. This

relative, Nancy Morales Enriquez, based Luna Huezo's reputation solely on family or

holiday gatherings. Thus, the reputation was not formed within a generalized and neutral

community.

Sufficiency of Evidence

Juan Luna Huezo asserts that the State presented insufficient evidence to convict

him of any of the three charges. In so arguing, he emphasizes that Tammy and Bonnie

uttered conflicting statements about the alleged crimes and that Dr. Shannon Phipps

found no physical evidence during Tammy's exam to support the allegations of sexual

misconduct. When reviewing a challenge to the sufficiency of evidence, we must

determine, whether, after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

The jury convicted Juan Luna Huezo of one count of rape of a child in the first degree, for conduct against Tammy, and two counts of child molestation in the first degree, one count each against Tammy and Bonnie. For the count of rape and child molestation of Tammy, the jury found the aggravating circumstance of an ongoing pattern of sexual abuse. For all three counts, the jury found the aggravating circumstance of breach of a position of trust.

RCW 9A.44.073(1) governs rape of a child in the first degree. The statute declares:

> A person is guilty of rape of a child in the first degree when the person has sexual intercourse with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least twenty-four months older than the victim.

RCW 9A.44.010(1) defines "sexual intercourse" for purposes of sex offenses:

> 'Sexual Intercourse' (a) has its ordinary meaning and occurs upon any penetration, however slight. . . .

Tammy, the victim of the rape charge, testified that Juan Luna Huezo placed his penis next to her vagina in his bedroom and in a vehicle. More importantly, she averred that Luna Huezo put his penis in her mouth. She was eleven years old when the act occurred. Tammy has never been married to Luna Huezo. Luna Huezo was more than twenty-four months older than Tammy. Thus, the State presented evidence to fulfill all elements of the crime of rape of a child.

16

RCW 9A.44.083(1) governs child molestation in the first degree. The statute reads:

> A person is guilty of child molestation in the first degree when the person has, or knowingly causes another person under the age of eighteen to have, sexual contact with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim.

RCW 9A.44.010(2) defines "Sexual contact" as:

> 'Sexual contact' means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party.

Tammy, the victim of one of the counts child molestation, declared, during her testimony, that Juan Luna Huezo made sexual contact with her on several occasions. As already indicated, Tammy was under twelve years old and more than thirty-six months younger than Luna Huezo at the time of the sexual misconduct. Thus, the State presented sufficient evidence to convict on count 2.

Bonnie, the alleged victim of count 3, testified that, on one occasion, Juan Luna Huezo touched her private area and moved his fingers around. Bonnie was then ten years old. She has never married Luna Huezo. Luna Huezo was at least thirty-six months older than Bonnie. Thus, the State presented sufficient evidence to convict on count 3.

RCW 9.94A.535 lists the relevant aggravating circumstances of an ongoing pattern of sexual abuse and a position of trust:

Except for circumstances listed in subsection (2) of this section, the following circumstances are an exclusive list of factors that can support a sentence above the standard range.

. . . .

(g) The offense was part of an ongoing pattern of sexual abuse of the same victim under the age of eighteen years manifested by multiple incidents over a prolonged period of time.

. . . .

(n) The defendant used his or her position of trust, confidence, or fiduciary responsibility to facilitate the commission of the current offense.

RCW 9.94A.535(3)(g) and (n).

The State presented sufficient evidence to support the aggravating circumstances findings. Juan Luna Huezo sexually abused Tammy on multiple occasions over the course of years. Luna Huezo was the stepfather to Tammy and Bonnie when he engaged in the criminal behavior. He thus used his position of trust to facilitate the crimes.

Juan Luna Huezo highlights that Tammy told his attorney that her mother was present in the home at the Hawaiian Village apartment thirty times when he sexually touched her. Tammy also told defense counsel that Luna Huezo touched her fifty-eight times at the apartment, twenty times at Niashia Morales Enriquez's residence, and thirty times at the Steptoe house. Tammy, during trial testimony, significantly limited the number of times of molestation. Luna Huezo further highlights that Tammy and Bonnie, at one point in their respective testimony, each testified that nothing happened or that they could not remember what happened.

18

Despite occasional and understandable difficulty in testifying, both Tammy and Bonnie identified and described occasions when Juan Luna Huezo sexually touched them. We have already repeated some of that testimony. Inconsistent testimony of a witness does not equate to insufficient evidence. *State v. West*, 2017-Ohio-4055, 91 N.E.3d 365, 376.

Although the State need not have presented evidence beyond the children's testimony to convict Juan Luna Huezo, circumstantial evidence bolstered Tammy's accusations. According to Tammy, Luna Huezo used a condom he obtained from a backpack, which police later found in that backpack. She also stated that he used oil on his penis, which he admitted to using during sexual activities. Tammy described an occasion when Luna Huezo duct-taped her hands, and police found duct tape and zip ties in his backpack. Finally, Tammy testified that she confronted Luna Huezo about abusing Bonnie, to which he admitted.

Juan Luna Huezo next challenges the sufficiency of evidence due to Dr. Shannon Phipps' examination of Tammy uncovering no physical evidence in support of sexual contact. Nevertheless, Dr. Phipps explained that the lack of medical evidence does not rule out rape or molestation. Luna Huezo cites this court no case law supporting the proposition that the State must present medical testimony of physical injury in order to convict an accused of rape. The law is to the contrary. *State v. Boyd*, 84 N.M. 290, 502 P.2d 315, 317 (Ct. App. 1972).

STATEMENT OF ADDITIONAL GROUNDS

Juan Luna Huezo raises numerous issues in a statement of additional grounds

(SAG).  We discuss and reject each ground.

Opinion Testimony Regarding Victim Credibility

Juan Luna Huezo asserts that the State elicited opinion testimony from him that

created an inference that he vouched for the credibility of Tammy and Bonnie.  He argues

that the trial court erred by allowing the State to engage in prosecutorial misconduct by

violating the motion in limine.

Prosecutorial misconduct "requires a new trial only if the misconduct was

prejudicial." *State v. Stith*, 71 Wn. App. 14, 19, 856 P.2d 415 (1993).  Such misconduct

is prejudicial when "there is a 'substantial likelihood' that the misconduct 'affected the

jury's verdict.'" *State v. Stith*, 71 Wn. App. at 1-9.  Cross-examination "designed to

compel a witness to express an opinion as to whether other witnesses were lying

constitutes misconduct." *State v. Stith*, 71 Wn. App. at 18.

During the cross-examination, the State asked Juan Luna Huezo:

> Isn't it true during that interview you told Detective Santoy that
> [Tammy] would never lie about anything this serious; isn't that true?

RP at 401.  The trial court overruled an objection to the question and later permitted the

State's attorney to ask whether he made a similar statement about Bonnie.

Juan Luna Huezo presents the court no authority that the State may not question the accused about statements he uttered to another regarding the truthfulness of the victim. Regardless, we find no prejudice in the questions and answer because of the overwhelming evidence, including circumstantial evidence, of the crimes and Luna Huezo's concession to Tammy of the abuse of Bonnie.

### Right to Remain Silent

Juan Luna Huezo argues that the State extensively commented on his right to remain silent and thus committed misconduct by using his silence as substantive evidence of guilt. Luna Huezo did not object to any purported misconduct during trial.

A defendant waives a claim of prosecutorial misconduct when failing to object to the conduct during trial, unless he or she demonstrates that the "misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice." *In re the Personal Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). The State may not use a defendant's silence as substantive evidence of guilt. *State v. Burke*, 163 Wn.2d 204, 206, 181 P.3d 1 (2008).

When cross-examining Juan Luna Huezo about his comments about the hygiene of Tammy, the prosecutor asked or commented: "This is the first we're hearing about all this; Isn't that true?" RP at 399. During summation, the prosecuting attorney remarked:

> He waited an entire year to now tell his side. Didn't tell it that day. Maybe he's had some time to think about it.

21

RP at 464.

We agree that the questioning and closing remarks at least indirectly criticized Juan Luna Huezo for remaining silent before trial. Nevertheless, we do not find any misconduct flagrant or prejudicial because of the overwhelming evidence of guilt.

### Shift of Burden of Proof

Juan Luna Huezo contends that the State improperly shifted the burden of proof to him. He references the prosecuting attorney remarks during summation:

> [Luna Huezo] took the stand and he told you, . . . [t]hat there is also this thing that happened the morning of 2-8 where [Tammy] witnessed him pulling [Bonnie's] hair. . . . And something about Tammy not wiping herself.
> You know what's interest? Think about this.
> No question was ever asked of Kelly about any of that. Huh. Don't you think that's weird? No question was asked of [Bonnie] about any of that. None of that was mentioned in opening statement. Why is that? Because it only came in through him. Nobody else was asked about any of that. Think about that. Why? Because it's not true.

RP at 463-64.

During closing argument, the prosecution may not suggest that the burden of proving innocence rests with the defendant. *State v. Thorgerson*, 172 Wn.2d 438, 453, 258 P.3d 43 (2011). Nevertheless, a prosecutor holds wide latitude to argue reasonable inferences from the evidence. *State v. Thorgerson*, 172 Wn.2d at 453. The prosecutor may attack the credibility of the accused. *State v. Berube*, 171 Wn. App. 103, 117, 286

P.3d 402 (2012).  By attacking Juan Luna Huezo's credibility, the State did not shift the burden of proof.

Ineffective Assistance of Counsel

Juan Luna Huezo argues that he received ineffective assistance of counsel due to defense counsel's failure to (1) withdraw, (2) cross-examine and impeach witnesses, and (3) move for dismissal for spoliation of evidence.  To prevail on a claim of ineffective assistance of counsel, the accused must show that defense counsel's representation was deficient and the deficient representation prejudiced him.  *State v. Estes*, 193 Wn. App. 479, 488, 372 P.3d 163 (2016), *aff'd* 188 Wn.2d 450, 395 P.3d 1045 (2017).  Prejudice exists if there is a reasonable probability that, except for counsel's errors, the result of the proceeding would have differed.  *State v. Estes*, 193 Wn. App. at 488.

Juan Luna Huezo argues that defense counsel should have withdrawn as counsel after suffering the tragic death of his niece during the trial and because of other family deaths preceding trial.  In response to the niece's death, the trial court granted a one-day recess in order to give counsel a chance to rest before proceeding further with trial.  Counsel stated that a brief continuance would be sufficient.  Counsel tragically lost three siblings to cancer in the thirteen months prior to his niece's death.  Nevertheless, the record does not evidence that any of these tragedies impacted defense counsel's ability to represent Luna Huezo during trial.

RPC 1.16 provides:

> (a) Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall, notwithstanding RCW 2.44.040, withdraw from the representation of a client if:
>
> . . . .
>
> (2) the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client.

No evidence supports the violation of this rule of ethical conduct.

Juan Luna Huezo argues that his trial counsel's failure to cross-examine Bonnie and to impeach Tammy with her prior inconsistent statement prejudiced him. Generally, courts entrust cross-examination techniques to the professional discretion of counsel. *In re Personal Restraint of Davis*, 152 Wn.2d 647, 720, 101 P.3d 1 (2004). In determining a claim of ineffective cross-examination of a witness, a court need not determine why trial counsel did not cross examine if that approach falls within the range of reasonable representation. *In re Personal Restraint of Davis*, 152 Wn.2d at 720. Luna Huezo's counsel may have deemed that the testimony of the victims by itself raised questions of their credibility, that cross-examining the victims more would have obtained no additional helpful information, and that a cross-examination of young girls might dismay the jury.

Finally, Juan Luna Huezo maintains that his trial counsel should have moved for dismissal in response the State's failure to preserve the zebra blanket. The zebra blanket was at most potentially useful, not exculpatory, evidence. Luna Huezo allegedly used

24

this blanket to silence Tammy by stuffing it into her mouth. Detective Santoy decided not to preserve the blanket or test it for DNA because of its access to numerous children.

Due process requires the State to disclose material exculpatory evidence to the defense and to preserve such evidence for use by the defense. *State v. Donahue*, 105 Wn. App. 67, 77, 18 P.3d 608 (2001). Failure to preserve potentially useful evidence does not constitute a denial of due process unless a criminal defendant can show bad faith on the part of the State. *State v. Donahue*, 105 Wn. App. at 78. Juan Luna Huezo does not show bad faith or that the blanket would have advanced his defense.

### Cumulative Error

Juan Luna Huezo argues that the combined effect of the aforementioned errors denied him a fair trial under the cumulative error doctrine. The cumulative error doctrine may warrant reversal, even if each error standing alone would otherwise be considered harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). The doctrine does not apply when the errors are few and have little or no effect on the outcome of the trial. *State v. Weber*, 159 Wn.2d 252, 279 (2006). Assuming any errors in Juan Luna Huezo's trial, we deem any errors minimal and harmless.

### CONCLUSION

We affirm Juan Luna Huezo's three convictions.

No. 36001-6-III
*State v. Huezo*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, A.C.J.

_____
Lawrence-Berrey, J.